Original,
No. 5548.

DONOVAN'S CASE.

Hearings September 19, 1966,
and
November 16, 1966.

Decided February 24, 1967.

*L. Wilder Quint,* Chairman, and *Irving H. Soden* for the Committee.

*William D. Tribble* for Daniel E. Donovan, Jr.

PER CURIAM. Daniel E. Donovan, Jr. became a member of the bar of New Hampshire in 1954 and has engaged in the practice of law since his admission. He served as solicitor for the city of Concord from 1957 to January 10, 1966. At the time of these hearings he was employed in the office of a member of the bar of this state.

The first item of the specifications filed by the Committee read in part as follows:

"( 1 ) On or about November 15, 1965 one Mrs. Lois Pindar of Concord, N. H. filed a complaint with this committee relative to Attorney Donovan's handling of a certain real estate matter, one aspect of which involved a certain litigation in the Merrimack County Superior Court. On December 27, 1965, Attorney Donovan was notified that the complaint would be heard by this committee on January 7, 1966, at 10 A.M. He failed to appear at the hearing but did appear on January 10, 1966 at 10 A.M., stating that he had confused the hour set for the hearing with the day of the month. "

The litigation in question was a bill to quiet title to certain real estate in which Mrs. Pindar claimed an interest as did the son of her former husband as administrator of his father's estate. The evidence warranted the conclusion that much of the delay

complained of could be attributed to an unrealistic price set by Mrs. Pindar on this real estate which the parties had agreed to sell and also to the actions of the administrator. The Justice who heard this complaint found "that there was no willful wrong, intentional misconduct, or deceit. Donovan has not profited nor sought to profit from this case and has been paid nothing for his services. However, it does appear . . . that he did not apply as much energetic pressure as the circumstances apparently required. " We agree with these findings and this conclusion.

The second item of the specifications filed by the Committee read in part as follows:

"In late March 1966, it came to the attention of . . . [the] Chairman of the Committee, that one Mrs. Ada Woodward of Concord . . . was concerned and dissatisfied relative to Attorney Donovan's handling of an estate of one Floyd A. Bagaty, late of Concord, in which Mrs. Woodward was interested. It subsequently appeared that . . . [Bagaty] died testate on February 4, 1965. Attorney Donovan was named as executor of the will. The original will [which was delivered to Donovan] ultimately became lost, but although a true and complete copy of the will was available, said copy was never offered for probate. In the meantime, Attorney Donovan gave the appearance of acting as executor, and for a long time led Mrs. Woodward to believe that the estate was being handled in a normal manner. An investigation ultimately disclosed the failure to file any will for probate. New counsel was retained, and a copy of the will [which Donovan testified he found in back of a file in his office at about this time] was offered for probate. A new executor was appointed. "

Thereafter Donovan turned over to the attorney for the new executor a statement showing disbursements he had made on behalf of the estate from his own personal funds in the amount of $773.40. He deducted therefrom the amount of $525, the price at which his wife purchased the automobile of the deceased, and his statement showed a balance due him of $208.40.

However, there was introduced in evidence a photostatic copy of a check in the amount of $300, the proceeds of an insurance policy on the life of the deceased, made to the order of Donovan and endorsed by him on February 26, 1965. He admitted he must have received the check "but I do not recall it . . . and certainly have no intention to withhold. " There was also a check

of $10, the proceeds of a Christmas club in the name of the deceased, which was endorsed by Donovan and not accounted for in his statement. This changes the statement submitted by Donovan from a balance due him of $208.40, to a balance owed by him to the estate of $101.60.

While acting as though he were the duly appointed executor of this estate for about a year, when he knew he was not, Donovan was guilty of misrepresentations made with the obvious intent to mislead the beneficiaries under the Bagaty will. There was evidence that an attorney with whom he was associated was led to believe that he had been appointed "probate appraiser for the estate" and this attorney acted accordingly in making an appraisal of this estate which amounted to over $17,000.

One Mundy, the devisee under the Bagaty will of a camp property which he wanted to mortgage to obtain funds to further his education, applied to a bank for that purpose. Donovan was asked to prepare an abstract of the title. "The bank kept giving information that the abstract hadn't arrived and they were told from time to time that it was in the mail." There was also evidence that Donovan told Mundy that the bank where he had applied for the loan "was so technical in the matter of titles that they would never approve this property." There was further evidence that Donovan told an officer of this bank "that the title was so defective that it would be unacceptable to them for mortgage purposes." However there was testimony that counsel for this same bank thereafter examined the title to this same property and found it acceptable as security for the mortgage.

Mrs. Woodward, a beneficiary under the Bagaty will was concerned because there were bonds in the amount of $3,200 in a bank safety deposit box payable to her at the testator's decease. Her right of access to the box, as a deputy of the testator, was terminated at his death and "she called this to Mr. Donovan's attention and she never was able to get a satisfactory answer or explanation as to why she couldn't get at these bonds."

The third item of the specifications was in part as follows:

"(3) Sometime in May 1966, it was brought to the attention of the committee that the firm of Mitchell & Hicks, Inc., plumbing contractors of Concord . . . was dissatisfied with Attorney Donovan's handling of a claim for labor and materials arising out of the construction of a certain shopping center at Littleton . . . The committee was advised by new counsel for Mitchell & Hicks,

Inc. that said claim was in excess of . . . $7,000, and that . . . [it] was either the largest creditor or one of the largest creditors on the project. There was various litigation . . . [and] the committee was advised that all creditors with the exception of Mitchell & Hicks, Inc. had recovered under a certain bond involved in the above litigation . . . The committee was . . . informed that . . . Donovan settled this particular matter with his former client by the payment of . . . $3,000 from his own personal funds. "

There was evidence that the loss to this client resulted from the failure of Donovan to properly secure its lien and to file its claim and his appearance on its behalf in one of the proceedings. These failures resulted in Donovan not receiving notice of the hearing at which the claims were settled and caused the omission of the client's claim in the settlements which resulted. The treasurer of Mitchell & Hicks testified "Infrequently, I would call him [Donovan] or if I met him on the street I would mention to him, ask him how the case was coming. " "He would fill me in more or less. " The witness met Donovan around March 1966 and asked him if the claim should be written off for tax purposes in the company's fiscal year ending March 31, 1966. "He told me perhaps I should write it off this year, that it looked as though perhaps we had lost it. " All claims on file had been paid by January 8, 1965. However before writing off the claim, as advised by Donovan, the witness had an opportunity to consult his bond agent on another matter and learned from him that "the claims have all been paid. "

The final matter considered at the hearings related to the purchase on June 23, 1965 by the city of Concord from one Walker for about $7,000 of a parcel of land for a parking lot. Donovan who was then city solicitor testified that the first knowledge he obtained about negotiations for this purchase was on June 14, 1965 at a meeting of the board of aldermen, which he later had to leave because of illness which confined him to his home for some time thereafter. On June 21 he received a telephone call at home from the mayor's office asking him to check an abstract of this property. It was brought to his home and Donovan checked it for the period until 1958 which is all the abstract covered. He then called the mayor and advised him that the abstract appeared to be all right as far as it went but that it was not complete. However he failed to advise the mayor that

the title should be checked to date before the purchase was made.

On June 23, 1965 the day on which Walker executed the deed to this property, Donovan received a call at home from the city finance director pertaining to the checks to be issued for its purchase price. At Donovan's instruction two checks were delivered to his office one of which was picked up there by the seller, the other of which Donovan's secretary on his order sent to a mortgagee in Manchester. There was no evidence that Donovan made any inquiries as to the state of the title to this property at that time.

A check of the records by the city solicitor who replaced Donovan after his resignation on January 10, 1966, revealed there were at the time of the sale five or six liens on this property which amounted to about $3,000. The seller was not then in a position to remove these encumbrances and a bonding company covering the liability of Concord city employees paid this amount to remove the encumbrances.

The record as a whole warrants findings that the defendant was guilty of inattention and negligence in handling these several matters entrusted to him by his clients in the course of about two years. Furthermore, in order to cover up these deficiencies, he resorted to the making of misleading statements to his clients and to others pertaining to the affairs entrusted to him. These acts and omissions were detrimental to his clients and his conduct did not measure up to the standards demanded of the members of the bar of this state. See *Hines* v. *Donovan*, 101 N. H. 239, 244.

This court has the obligation and the power to make appropriate disciplinary orders for the protection of the public, the maintenance of public confidence in the bar as a whole, and the prevention of the recurrence of similar conduct. *Barnard's Case*, 101 N. H. 33, 34. Each case must be determined on its own facts and circumstances and a disciplinary measure adopted which is warranted thereby and designed to accomplish the ends sought by it.

We are satisfied from the record that Donovan did not intend to profit financially from his conduct in any of these matters and that he did not do so. Furthermore, the evidence reveals that he received no fees in most instances and had to disburse considerable funds of his own to conclude one of these cases. These factors, as well as other mitigating circumstances which

appear in the record, bear on the extent of the disciplinary action but do not dispense with the necessity for it. *Broderick's Case,* 104 N. H. 175, 178.

The defendant is suspended from the practice of law in this state for a period of three months beginning February 24, 1967, and furthermore shall not resume the practice of law except under the supervision of a member of the bar of this state until further order of this court. See Annots. 69 A.L.R. 705; 96 A.L.R. 2d 823.

*So ordered.*