Original,
No. 6280.

MUSSMAN'S CASE.

December 30, 1971.

*Wayne J. Mullavey, Joseph A. DiClerico,* and *N. Michael Plaut* ( by brief and orally ), for the Board of Governors of New Hampshire Bar Association.

*Devine, Millimet, McDonough, Stahl & Branch* ( *Mr. Joseph A. Millimet* orally ), for Mack M. Mussman.

PER CURIAM. Petition for disciplinary action on a complaint of professional misconduct filed in this court against Attorney Mack M. Mussman of Littleton by the Board of Governors of the New Hampshire Bar Association. The complaint set out in detail Mussman's conduct alleged to constitute violations of the ethical standards of the bar of New Hampshire. It also specified certain canons and disciplinary rules of the ABA Code of Professional Responsibility ( 1969 ), adopted by the New Hampshire Bar Association in January 1970, which his conduct is alleged to have violated. *See In re Unification of the New Hampshire Bar,* 109 N.H. 260, 248 A.2d 709 ( 1968 ). This court ordered the matter referred to Judicial Referee *Amos N. Blandin, Jr.,* for hearing and report and further ordered that Mussman be notified of the pendency of the petition and complaint by service on him of a copy thereof with the orders thereon. *See In re Ruffalo,* 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222 ( 1968 ); 1 Antieau, Modern Constitutional Law *s.* 6.91 ( supp. 1970 ).

At the hearing before the referee the records in *Stephenson* v. *Stephenson* ( 111 N. H. 189, 278 A.2d 351 ( 1971 ) ) and *Morin* v. *Morin* ( Grafton Eq. 10,398 ), wherein as counsel for one of the parties the alleged unethical conduct of Mussman took place, were offered in evidence and marked as exhibits. In addition thereto the testimony of various witnesses, including that of Mussman himself, was received in evidence subject to cross-examination. Requests for findings and rulings were submitted to the referee. Among the findings and rulings made by him was a rul-

ing that the burden was on the bar association to prove its charges by clear and convincing proof, and a finding that "the conduct of the defendant Mussman was highly prejudicial to the administration of justice, and that it reflects drastically on his fitness to practice law."

The matter is now before this court on the following issues: ( 1 ) whether the record supports the findings and rulings of the referee, and ( 2 ) if it does, what action should be taken in regard to Attorney Mussman.

Count 1 of the specifications in the petition deals with an action of divorce brought in the Superior Court of Grafton County by Katherine Holman Stephenson against Edwin Charles Stephenson and two bills in equity instituted by her in the course thereof to set aside as fraudulent a transfer of certain assets of Edwin. Mussman was counsel for Edwin in these matters. Edwin was the sole stockholder in Ski-Pine Club, Inc. which owned land and buildings in Sugar Hill consisting of 114 acres and a 22 room house which were free of encumbrances. As part of the divorce proceedings counsel for Katherine had obtained a court order allowing the above property to be appraised and photographed. Before this could be done, however, a corporation was formed by Mussman under the name of Sugar Hill Manors, Inc. of which Mussman was elected president, treasurer and a director. 300 shares of capital stock were authorized at the organization meeting of Manors. Ski-Pine conveyed to Manors its land and buildings valued by Edwin's expert at $40,000 and by Katherine's expert at $100,000 and received therefor 75 shares of Manors stock. Mussman paid in $1000 and was issued 151 shares of Manors. When counsel for Katherine called Mussman to arrange for an expert to visit this property in connection with the divorce proceeding, he was informed by Mussman that it no longer belonged to Ski-Pine but had been transferred to a new corporation, Manors. Katherine then instituted two bills in equity alleging in part that Edwin was then $2400 in arrears in support payments ordered by the court and that the transfer was fraudulent. They were tried together with the divorce proceeding by *Johnson*, J.

Mussman testified in those proceedings that the transfer of the Ski-Pine property to Manors was the first step in a plan he had devised to develop the property and to provide Edwin with employment. The buildings were to be renovated for use as a clubhouse and the land sold as 131 lots. Mussman intended to invest $100,000 and had secured other investors who would make

available an additional $200,000. He testified that he and the other investors could benefit from the project to an amount of $250,000 each for their investment, or $750,000 total, and that Edwin would also benefit in the amount of $250,000. Mussman testified at a hearing on a preliminary injunction in the bills in equity that it was proposed to hire Edwin as manager at $10,000 to $15,000 salary per year. This was modified to $7500 plus room and board at the hearing on the merits. The records of a corporate meeting of the directors of Manors ( Mussman, his law associate, now his partner, and another person, not Edwin ) showed a vote to employ Edwin for one year at a mutually agreed upon salary.

Mussman stated that for tax purposes he and the other investors would make their $300,000 investment by way of loans at 7 1/2 percent interest. For a total cash investment of $3000 in Manors these investors were to receive three-fourths of its stock. Edwin, through Ski-Club, for the transfer to Manors of property valued at $40,000 by one expert and at $100,000 by another, was to receive the remaining one-fourth of the stock. The plan envisioned an eventual board of directors of Manors made up of Mussman and the other cash investors. Edwin was not to be a director. A temporary injunction against proceeding with the plans was issued March 13, 1970 with the proviso that "if the whole long-term plan of Sugar Hill Manors, Inc. were reduced into legally enforceable contracts under which Mrs. Stephenson would have sufficient legal rights to realize the value of the asset in question in the event that she was awarded the land and buildings as part of a divorce decree, then the Court would reconsider the injunctive relief . . . granted. " There is no evidence that the plans for development were ever pursued further, or reduced "into legally enforceable contracts. "

In its final decree the Trial Court ( *Johnson*, J. ) found that at the time of the transfer of land from Ski-Club to Manors "there was no question but that the matter of a property settlement between the Stephensons would be a matter of controversy in the divorce proceeding. The Court finds that the purpose and intent of this transfer under the circumstances was to deprive Mrs. Stephenson of her right to have the Court make a meaningful property settlement . . . and hence the transfer was intended to defeat and defraud Mrs. Stephenson's rights. " The court ordered it rescinded and set it aside and the property reconveyed. This court, on appeal, found and ruled this finding and order warrant-

ed by the evidence. *Stephenson* v. *Stephenson,* 111 N. H. 189, 278 A.2d 351 ( 1971 ). The referee on the evidence before him could also properly find, as he did, that the transfer was fraudulent.

The bar association in its complaint against Mussman charges that the above action taken by him on behalf of his client was contrary to canon 7 and in violation of Disciplinary Rule 7-102 ( A ) ( 1 ) of the ABA Code of Professional Responsibility which forbids a lawyer to take action " on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another. "

At the hearing on the complaint, Mussman by testimony and argument took the position that there was a legitimate business reason for the transfer of the property as it was an attempt to rehabilitate his client and to reconcile him with his wife. The referee found, however, that the purpose and intent of the transfer was to deprive Mrs. Stephenson of her right to have the trial court make a meaningful property settlement and that the desire for reconciliation played no substantial part with either Edwin or his counsel Mussman. The referee further found that the transfer was designed primarily to harass and delay Mrs. Stephenson and to benefit financially Mussman and the other investors. A review of the evidence in the trial court and in the disciplinary proceedings reveals that there was clear and convincing evidence to support the above findings by the referee.

The complaint also alleges that Mussman's actions in the transfer violated canon 7, disciplinary rule 7—102( A ) ( 7 ) which provides that a lawyer shall not " [c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent. " It is also charged that his conduct violated canon 1, disciplinary rule 1—102( A ) ( 4 ) which provides that a lawyer shall not engage in conduct involving fraud. The trial court, as hereinbefore stated, found the transfer to be· fraudulent and this court sustained the finding as warranted. *Stephenson* v. *Stephenson supra.* At the disciplinary hearing Mussman testified that the idea of the transfer was first brought up by his client who came to him and said: " I got an idea . . . why don't I set up a development corporation, develop the property. " At the hearing on a temporary injunction Mussman stated to the court: " I came upon the idea that maybe we could form a corporation . . . subdivide the property . . . sell lots . . . and give Mr. Stephenson a job . . . . · So we went ahead

and formed a corporation. " Mr. Stephenson at the hearing on the merits before the trial court said the transfer was " our idea " " Mr. Mussman and myself. " On all the evidence before him the referee was warranted in finding that Mussman counseled or assisted his client in conduct that he ( Mussman ) knew or should have known to be illegal and fraudulent and that this constituted unprofessional conduct and malpractice on his part.

The complaint also charges that Mussman's action in purchasing a substantial amount of shares in Manors was the acquisition of an interest in the subject matter of the litigation in violation of canon 5, disciplinary rule 5 — 103 ( A ). Mussman took the position that it is not a violation of this rule to acquire property owned by a client if the client consents and understands the transaction. In our opinion this misconstrues the purpose of the rule. It must have been clear to him as an experienced attorney that this property would play an important part in the award of alimony, support and the division or apportionment of the property of the parties in the divorce proceeding. RSA 458:17-19. By acquiring an interest in the corporation which owned it he was prejudicing the rights of the wife and provoked additional litigation in the nature of the two bills in equity brought by the libelant in which Mussman was made a party defendant. This was contrary to the purpose of disciplinary rule 5 — 103 ( A ) which is to prevent the stirring up of strife and litigation, which Mussman should have anticipated would and did result from his actions. *See* Drinker, Legal Ethics 99 ( 1954 ). *See also* ABA Code of Professional Responsibility DR 5 — 103 ( A ) Note 32 and ABA Canons 10 and 28 in Am. Jur. 2d Desk Book, Doc. No. 91, at 224, 229. The referee properly found that " the acquisition by Mussman of a two-thirds interest in the real estate of his client . . . which had an estimated value of $100,000 by payment of only $1,000 constituted unethical conduct, " and that his participation in the transfer of Ski-Pine obstructed justice.

Count 2 of the bar association complaint pertains to a divorce action in which Mussman represented the husband, Armand L. Morin, and Charles F. Tesreau, Esq., represented the wife, Norma G. Morin. Mussman is charged with having communicated and dealt with Norma when he knew she was represented by Tesreau without the prior consent of her attorney in violation of canon 7, disciplinary rule 7 — 104 ( A ) of the code which prohibits such conduct. It is alleged that on September 16, 1968 while the divorce

action between the parties was pending Armand persuaded his wife to accompany him to the office of his attorney, Mack M. Mussman, where stipulations pertaining to custody, support, and disposition of the property of the parties were drawn by Mussman and executed by the parties. These stipulations became operative when an uncontested divorce was obtained by Armand.

The evidence is uncontradicted that the Morins were in Mussman's office on September 16, 1968 and that a stipulation was then drawn and executed in their pending divorce proceedings. It was not denied that Mussman knew that Mrs. Morin was represented by Attorney Tesreau in the divorce matter. Tesreau testified that he had been retained to represent Mrs. Morin and filed an appearance on her behalf on May 7, 1968, a copy of which was sent to Mussman. He saw her three or four times and had received letters and telephone calls from her. Having received no answer to a letter which he had written to her about a hearing in the matter scheduled for September 18, 1968, he finally reached Mrs. Morin by telephone on September 16, the day the stipulations were signed, and asked her about his previous letter. " She asked me if I had heard anything from Mr. Mussman and I said I had not. She said ' You've been released. Mr. Mussman is writing a letter. ' And I suggested this was rather sudden and she said she had signed papers in Mr. Mussman's office. I then inquired about the papers but this was vague. " Tesreau further testified that prior to this conversation with Mrs. Morin he had heard nothing about his services having been terminated either by telephone, orally, or by mail.

Mrs. Morin testified that on September 16th her husband came to her apartment and said " we're going down to Mussman's office. " She did not feel at that point that she had any choice to do otherwise. She also testified that in Mussman's office she signed a letter discharging Tesreau and that Mussman told his secretary to put it in an envelope and in the mail right away. She also testified that Mussman had a pad of paper in front of him when he was dictating the stipulation and that he was referring to notes thereon and to her husband in so doing. She testified further that when she signed the stipulation she didn't think she had any choice. The stipulation dealt with the disposition of a 49 unit motel in Littleton and of two parcels of land nearby and " five farms in the State of Vermont. " It provided that Mrs. Morin was to receive no support or alimony and divided the custody of an 11 year old son between the parties.

Mussman's secretary testified that this stipulation, which was signed by both parties and later became a part of the decree in the uncontested divorce granted to Armand, was drawn in Mussman's office in the absence of Mrs. Morin. "Each paragraph Mr. Morin discussed with Mr. Mussman, explained exactly how he wanted it, how they wanted-they agreed on it, and then Mr. Mussman would dictate each paragraph after the discussion." Mussman testified that Mr. Morin gave him all the information about the stipulation and "I dictated it to my secretary in front of him and he was assisting."

The stipulation read in part as follows:

"1. Norma G. Morin agrees to quit-claim to Armand L. Morin all real estate standing in both names in the State of New Hampshire and the State of Vermont and the same shall pertain to any property standing in her name alone and also to release any dower rights in any property standing in the name of Armand L. Morin; The real estate being as follows: —

"A. Land and building known as the Continental 93 in Littleton, New Hampshire;

"B. Land known as The Trailer Park adjoining the so-called Continental 93 and another parcel of land on the opposite side of the Trailer Park to the Continental 93;

"C. Five farms in the State of Vermont, located in Orleans County, Towns of Charleston, Brownington, West Moore and Morgan. Also any right, title and interest in the 50% equity held by said Armand L. Morin in the Lyndon Covered Bridge property in Lyndonville, Vermont and the land and buildings at One Main Street, Lyndonville, Vermont and also any interest in the Armand L. Morin and Darling Timbers."

On September 18, 1968, two days after the stipulation was prepared and executed, Mussman made the following statement to the presiding justice hearing a motion for continuance previously filed by Mrs. Morin's attorney, Charles Tesreau.

"I don't want Charlie [Tesreau] to be under any misapprehension that somebody is taking advantage of anybody. The Continental 93 is mortgaged to the hilt, $375,000.00, which is just exactly one hundred per cent of its cost. So there's no equity whatsoever in there. This I have verified. As far as anything else is concerned, that's in Vermont, an old farm, you know, what they call an abandoned farm, and they have one house in which she's entitled to live for the rest of her life. He was more than fair with her."

At the hearing before the referee Mr. Morin testified to the following in regard to the Continental 93 motel disposed of in Paragraph 1 A of the stipulation. The balance of the mortgage at that time was $350,000 and not $375,000 as stated to the court by Mussman. He further testified that he sold Continental 93 the year following his divorce for $540,000 which included also the personal property used in its operation. We turn next to Mussman's statement to the court " So there's no equity whatsoever in there [ Continental 93.] This I have verified. " Mussman's brief filed in this court states that his statement that there was no equity in the motel " was essentially incorrect " and " the statement that Mr. Mussman has verified it was based simply on his having consulted his client. "

As to the property described in paragraph 1 B of the stipulation, Mr. Morin testified that he sold one of those parcels for $44,000. At the hearing before the referee, Mussman testified that he did not know that this particular parcel was not part of Continental 93 as all three parcels ( 1 A and 1B ) had been bought as one. When asked why he did not tell the court that the property was described as three parcels in the stipulation, Mussman answered " He can read. " The record is unclear whether the stipulation had been filed and was available to the court or whether it was filed later on October 14, 1968 when the divorce was heard uncontested and the stipulation was made a part of the decree granting Armand a divorce.

Regarding paragraph 1 C of the stipulation, Mr. Morin testified that he then owned a two family house in Lyndonville which he later sold for $18,000. He also testified he had about $10,000 " tied up " in the total value of the land described generally as " five farms " which is about 300 acres of land. He further testified that the Lyndon Covered Bridge property was subsequently sold for $18,000. He also testified he had $2500 invested in Darlene Timbers a syndicate organized to buy and sell real estate. The stipulation contained no provision providing that Mrs. Morin could live in a house " they have " for the rest of her life.

It is evident that Mussman's representations to the presiding justice concerning the nature of the property involved in the stipulation and of its value, be they gratuitously made as contended by him, or otherwise, were not benchmarks of candor and truth. We hold that the referee was warranted in finding them to be " false representations . . . made for the purpose of inducing the Court

to permit Mr. Mussman's client to obtain an uncontested divorce based on the stipulations. " We hold further that the referee properly found that Mussman's conduct complained of was unethical and highly prejudicial to the administration of justice. Counsel's zeal in representing a client does not give him license to act in the manner disclosed by this record. *State* v. *Selby*, 156 Colo. 17, 396 P.2d 598 ( 1964 ); *In re Edward Kent*, 39 N.J. 114, 187 A.2d 718 ( 1963 ); *see* 7 C.J.S. Attorney and Client *s*. 23e ( 1937 ). It is true that an attorney has a duty to protect the interests of a client but the legal and ethical methods of performing this duty are solely the responsibility of the attorney. *Broderick's Case*, 104 N.H. 175, 181 A.2d 647 ( 1962 ); *Hines* v. *Donovan*, 101 N.H. 239, 139 A.2d 884 ( 1958 ).

This court has inherent and statutory ( RSA 311:8 ) power to supervise the conduct of attorneys for the protection of the public and the maintenance of public confidence in the bar as a whole. *Harrington's Case*, 100 N.H. ·243, 123 A.2d 396 ( 1956 ). The oath taken by an attorney on his admission to the bar ( RSA 311:6 ) as well as the ABA Code of Professional Responsibility adopted by the New Hampshire Bar Association provide concrete ethical guides by which an attorney can set his conduct. Any violation thereof which tends to bring reproach on the legal profession can be ground for disciplinary action by this court. *State el rel. Nebraska State Bar Ass'n.* v. *Nielsen*, 179 Neb. 55, 136 N.W.2d 355 ( 1965 ); *In re Opacak*, 257 Minn. 600, 101 N.W.2d 606 ( 1960 ). The attorney's oath and the ABA Code do not circumscribe the inherent and statutory powers of this court to judge the conduct of an attorney and find cause for appropriate disciplinary action. *Ricker's Petition*, 66 N.H. 207, 211, 29 A. 559, 561 ( 1890 ); *Harrington's Case supra*. Hence Mussman's conduct need not be judged by whether or not he has transgressed the letter of all or of any specific canon or disciplinary rule which his conduct is alleged to have violated. *In re Russell*, 59 N.J. 315, 282 A.2d 42, 43 ( 1971 ).

The referee could properly assess Mussman's conduct on the testimony before him and on the records in the two cases involved which were submitted as exhibits. 7 Am. Jur. 2d Attorneys at Law *s*. 66 ( 1963 ). We hold that on that evidence he could properly find that Mussman engaged in the conduct alleged in the complaint. We hold further that the referee properly found that his conduct in the *Stephenson* and *Morin* cases was unethical, highly

prejudicial to the administration of justice and that it reflects drastically on his fitness to practice law. *Broderick's Case supra*; *Hines* v. *Donovan supra*; *see* Annots. 1 A.L.R.3d 1113 ( 1965 ) and 17 A.L.R.3d 835, 844 ( 1968 ).

These findings impose on this court the obligation to make appropriate disciplinary orders for the protection of the public, the maintenance of public confidence in the bar as a whole, and the prevention of the recurrence of similar conduct. *Broderick's Case*, 104 N.H. 175, 181 A.2d 647 ( 1962 ). " Each case must be determined on its own facts and circumstances and a disciplinary measure adopted which is warranted thereby and designed to accomplish the ends sought by it. " *Donovan's Case*, 108 N.H. 34, 39, 226 A.2d 779, 783 ( 1967 ).

Mack M. Mussman has practiced law in this state continuously since 1937 and is now sixty-five years of age. The referee made, among other findings, a finding that a desire to bring about a reconciliation may have played some part in the transfer of the Stephenson property from Ski-Pine to a new corporation and that any personal interest which Mussman acquired therein was at the request of his client and of the other investors. He also found that Mrs. Morin's motive in entering into the stipulation, although not communicated to Mussman, was that she wanted to effectuate a reconciliation. These findings as well as other pertinent factors brought to our attention on behalf of Mussman must be considered and given the weight they deserve.

However the record warranted the referee's findings and his conclusion that Mussman's conduct as a whole was highly prejudicial to the administration of justice and reflected drastically on his fitness to practice law. Thus the referee found that Mussman's explanation of the essential charges of the complaint against him fell far short of being satisfactory. With this conclusion we are in agreement.

It is the opinion of this court that Mack M. Mussman's right to practice as an attorney in the State of New Hampshire should be and is hereby suspended. It is therefore ordered that Mack M. Mussman be suspended from the practice of law for a period to start January 31, 1972 and to continue until such suspension shall be terminated by further order of this court. No motion or other request to terminate the suspension shall be filed before the expiration of three years from the date such suspension takes effect.

*So ordered.*