Original
No. 85-205

## CONNOLLY'S CASE

April 9, 1986

*Thomas Welch*, of Exeter, orally for the Committee on Professional Conduct.

*Brown and Nixon P.A.*, of Manchester (*David W. Hess* orally), for the respondent.

SOUTER, J. This is an original disciplinary proceeding brought by the court's Committee on Professional Conduct against Daniel J. Connolly, a member of the bar. *See* SUP. CT. R. 37(3)(a) and (13). After investigation, the committee filed two complaints charging the respondent with conduct prohibited by the Code of Professional Responsibility as it existed prior to February 1, 1986, the effective date of the new Rules of Professional Conduct.

The first complaint alleged that the respondent had violated former disciplinary rules DR 1-102(A)(1), (4), (5) and (6), and 9-102(B)(3), while acting as attorney for Ruth E. Smead and as trustee of a revocable trust of her assets. (*Compare* with new RULES OF PROFESSIONAL CONDUCT 1.15(a)(2), 4.1(a) and 8.4(a), (c).) The second complaint alleged different acts violative of the same disciplinary rules, and of former DR 9-102(B)(1) as well. (*Compare* with new RULES OF PROFESSIONAL CONDUCT *supra* and 1.15(b).) As a disciplinary penalty for the series of violations charged in each complaint,

the committee recommended that the court suspend the respondent's right to practice law for six months, each suspension to run concurrently with the other. *See* SUP. CT. R. 37(13)(f).

When the respondent admitted that he had committed the violations charged, this court temporarily suspended his authority to practice law and to exercise fiduciary powers under court appointments. The court ordered him to give notice of the suspension to clients and others with interests in assets over which he had exercised fiduciary powers and over which he might continue to exercise fiduciary authority independently of judicial appointment.

Having initially admitted the violations, the respondent later stated through his counsel that he did not challenge the underlying findings of fact contained in the committee's reports to the court. He contested only the committee's recommendation that he be suspended from practice for six months. The subsequent arguments of counsel for the committee and for the respondent were therefore directed to the issue of disciplinary sanctions "necessary for the protection of the public and the preservation of the integrity of the legal profession." *Id.* After considering the committee's recommendations and assessing the mitigating circumstances that the committee and the respondent have called to our attention we have concluded that the respondent should be disbarred.

The first complaint charges the respondent with the substantive violations of fraudulent and dishonest conduct (DR 1-102(A)(4)); conduct prejudicial to the administration of justice (*id.* (5)); conduct reflecting adversely on the respondent's fitness to practice law (*id.* (6)); and failure to render an appropriate account of the receipts of a client's funds (DR 9-102(B)(3)). Although the committee viewed the findings of fact underlying the complaint as supporting a presumption that the respondent had exercised undue influence over a client in obtaining gifts from her, *compare* former CODE OF PROFESSIONAL RESPONSIBILITY, EC 5-5, with new RULES OF PROFESSIONAL CONDUCT 1.7(b) and 1.8(c); *see Edgerly v. Edgerly*, 73 N.H. 407, 408–09, 62 A. 716, 717 (1905); *Whipple v. Barton*, 63 N.H. 613, 613–14, 3 A. 922, 922 (1886), the complaints focused upon the respondent's dishonesty in attempting to conceal his receipt of funds so obtained.

The unchallenged facts are that between 1975 and 1980 the respondent, then practicing in Hanover, drew two successive wills for Ruth E. Smead, the first disinheriting her son and the second limiting the inheritance of her husband. Thereafter the respondent drafted instruments by which Mrs. Smead created several revocable trusts, of which the respondent then served as trustee. The committee found that the respondent "considered himself a friend, and perhaps a surrogate son to Mrs. Smead . . . [managing] her day to day

checkbook. . . ." (Report of Committee on Professional Conduct; further quotations in the statement of facts are from the same source.)

Given Mrs. Smead's dependence upon the respondent, she became concerned about his accessibility when he informed her in 1982 that he planned to leave Hanover in order to practice with a firm in Concord. At about the same time she learned that the respondent was in "substantial debt" following "financial setbacks," and she consequently offered to give him $35,000 to mitigate his financial difficulties. The respondent first declined, but when in April 1983 Mrs. Smead again offered to give him $35,000 over a period of time, he accepted. In the course of the next fifteen months the respondent received seven payments made by checks drawn on Mrs. Smead's personal account and signed by her or by the respondent under a power of attorney, or drawn on the Ruth E. Smead Trust account and signed by the respondent as trustee. The first payment in the amount of $7000 occurred in April 1983, followed by a second $7000 payment the following September.

In December 1983, Mrs. Smead's son travelled to New Hampshire where he visited both his mother and the respondent, whom he accused of working to disinherit him. After this visit Mrs. Smead and her son were reconciled, and she advised the respondent that she planned to move to California to be near the son, as she later did. When he heard this, the respondent asked Mrs. Smead if she intended to complete her promised gift to him; she replied that she did, and thereafter from February through July, 1984, the respondent received an additional $18,900 from Mrs. Smead's funds, for a total of $32,900.

As a final step in transferring the assets of the Ruth E. Smead Trust to California, on September 10, 1984, the respondent prepared his fifth and final account and sent it to a California bank, which had been designated to succeed him as trustee. In the account, the respondent falsely reported expenditures of $8,500 for medical and nursing expenses and for legal fees, thus disguising two payments in that total amount from the trust to him.

When a bank officer questioned some details of the account, unrelated to the deceitful entries, the respondent wrote to the bank falsely stating that $10,400 of trust assets had been improperly transferred to other trusts administered by the respondent's Concord firm. The respondent apparently selected that figure because it was the total of three payments made to him from March through June of 1984, by checks drawn on Mrs. Smead's personal account. The respondent sent the bank a check including that amount, plus $338.06 representing interest.

About two weeks later the respondent told his present counsel about the gifts from Mrs. Smead, about the false account, and about the false report to the bank. He and his counsel then disclosed this information to the respondent's Concord law firm, and thereafter to the committee. The firm repaid the balance of $22,500 that the respondent had received from Mrs. Smead and filed an accurate account. His counsel has represented that the respondent has borrowed money on a personal note to repay the firm both for its advances to replace Mrs. Smead's money and to restore misappropriated funds that are the subject of the second complaint.

This second complaint, like the first, charges dishonesty, together with failure to notify a client of funds received on the client's behalf and failure to account for such funds. The gravamen of this complaint is that the respondent misappropriated interest earned on estate accounts and, in one case, a tax refund received on behalf of such an estate.

The facts, again, are unchallenged. Following the events described above, the respondent's firm, with his cooperation, conducted its own audit of all client accounts to which he had access. The audit disclosed that the respondent had drawn funds for his personal use from four estate accounts over which he had had the power to write checks. After these disclosures, the respondent directed his firm to a fifth instance of the same conduct. The funds represented bank "interest income earned, and in one instance a tax refund received, after Final Accounts in the estates were prepared and submitted to the Probate Court. In each case the funds were not [listed in] the final account but rather were received after the last date posted in the Final Account." In two instances the respondent had charged legal fees against a portion of the interest money. Excluding the amounts of the claimed fees, the respondent's payments to himself totalled $2,784.

When he appeared before the committee, the respondent testified that he did not recall drawing checks to himself upon the assets of these estates, and he disclaimed any deliberate attempt to violate the Code of Professional Responsibility. At the committee level, he sought to explain these actions as reflecting his unfamiliarity with the practice of his Concord firm, which kept estate funds deposited in interest bearing accounts between the date of the last entry in the final account and the date of final distribution. He presented evidence that his former, Hanover firm had customarily transferred liquid assets to non-interest accounts in time to preclude accrual of such interest. Although the committee did not specifically comment on this explanation, it found to the requisite clear and convincing degree that the respondent had committed the violations as charged.

 These facts are the collective first premise on which we must decide what penalty is appropriate. The second premise is our judgment about the significance of the particular professional standards that the respondent has violated. Although this is not the occasion for us to make a comparative ranking of professional obligations, any consideration of standards for legal practice must recognize that the opportunities and the duties of our profession flow from the willingness of clients to trust us with what they value. A lawyer's obligation to refrain, at the least, from misuse of a client's property must therefore stand among the most insistent of professional norms. Consequently, although we consider the first complaint to be extremely serious, we give particular attention in this case to the second complaint, charging the respondent with misuse of funds belonging to his estate clients.

 This court's response to misuse of a client's funds has not been uniform over the years. In some instances it has been disbarment; *e.g., Harrington's Case*, 100 N.H. 243, 123 A.2d 396 (1956); *Barnard's Case*, 101 N.H. 141, 135 A.2d 902 (1957); *Donovan's Case*, 109 N.H. 103, 243 A.2d 308 (1968); and in other instances merely suspension; *e.g., Wholley's Case*, 110 N.H. 449, 270 A.2d 609 (1970); *Edes' Case*, 118 N.H. 815, 395 A.2d 498 (1978). Most recently, however, we have ordered disbarment, *Carroll's Case*, 127 N.H. 390, 503 A.2d 750 (1985); *Eshleman's Case*, 126 N.H. 1, 489 A.2d 571 (1985), and we have expressed our considered judgment in the rule that "[o]rdinarily, the misuse of a client's funds justifies disbarment." *Carroll's Case*, 127 N.H. at 393, 503 A.2d at 753 (citations omitted).

In the face of this general rule, the respondent's counsel has pressed a number of considerations in arguing that this is an exceptional case. Counsel stresses, for example, the respondent's choice to come forward on his own motion, both to disclose his dishonesty in accounting for the funds received from Mrs. Smead and subsequently to cooperate in auditing the estate files. Although this argument plainly carried weight with the committee, we will be candid to say that it carries much less with us.

We assess the argument's force in the light of the events that led to disclosure, beginning with the successor trustee's question about the Smead Trust account. The respondent reacted by restoring more money than he had ever received from the trust itself, and by writing a letter to the successor trustee, which suggested, in the opinion of the committee's counsel, that someone else in the respondent's Concord firm had wrongfully transferred the funds. We think it is unlikely that the respondent believed that the matter would rest there, after he had impugned his firm's fiduciary integrity. (The

record does not indicate whether the check sent to the California bank with the deceitful letter had been drawn on the firm's account; if it had been, discovery would have seemed certain even if the California fiduciary kept quiet.) In any event, it appears to us that the respondent came forward only when his rising fear of discovery had become panic, and we can not give his disclosure significant weight.

Nor do we believe that other facts remove this case from the general rule. Although the amount in question was under three thousand dollars, that is not *de minimis*. Although the respondent has made restitution to the victims, restitution is irrelevant to the seriousness of the original offenses. Indeed, in the case before us the restitution has come from borrowed money, and the respondent has not discharged the ultimate obligation. And although the respondent has not been charged criminally, "the critical fact prompting final disciplinary action is not the fact of conviction or indictment, but the underlying conduct. . . ." *Eshleman's Case*, 126 N.H. at 5, 489 A.2d at 573 (citations omitted).

We are not, however, unappreciative of the respondent's misfortunes during the period in question. The record indicates that ill health and the pressure of work, together with illnesses and a death among his friends and relations, placed the respondent under great strain. Nor are we unaware of his valuable service to the bar and to the legal system before the institution of these complaints. As the respondent's counsel has admitted, however, these facts do not excuse what the respondent did. They are, rather, to be given weight if the respondent applies for readmission to practice.

We therefore conclude that the violations as charged in the second complaint should be governed by the general rule, providing for disbarment in cases of misuse of clients' funds. Since there is no heavier penalty, it is not necessary to determine whether the same disposition would be appropriate under the first complaint, although the facts supporting that complaint may be considered along with mitigating circumstances in reviewing any request for readmission that the respondent may file in the future.

The respondent is disbarred.

*So ordered.*

KING, C.J., and BROCK and JOHNSON, JJ., did not sit; DUNFEY, C.J., and DALIANIS and DICKSON, JJ., of the superior court sat by special assignment under RSA 490:3; the others concurred.