Original
No. LD-86-005

## WEHRINGER'S CASE

August 5, 1988

*Brown & Nixon,* of Manchester (*David L. Nixon* and *Leslie C. Nixon* on the brief, and *Mr. Nixon* orally), for the Committee on Professional Conduct.

*Barto & Puffer P.A.,* of Concord, and *Cameron K. Wehringer,* of New York, New York, *pro se* (*Mr. Wehringer* on the brief and orally), for the respondent.

BATCHELDER, J. A disciplinary action was initiated against Cameron Kingsley Wehringer, Esq., after his participation in a divorce and child custody dispute between John and Audrey Brannigan in New York and Massachusetts. Following a hearing on the complaint against the respondent, the Committee on Professional Conduct (the Committee) filed with this court a petition for the disbarment of Wehringer. We appointed Maurice P. Bois, retired New Hampshire Supreme Court Associate Justice, as a referee to conduct a hearing on the petition under Supreme Court Rule 37(13)(e). Thereafter, the referee filed his report, finding violations of the Code of Professional Responsibility (Code), as in effect prior to February 1, 1986.

The respondent urges us not to grant the petition for disbarment on the following grounds: (1) he was denied a court-appointed attorney; (2) the referee's findings are not supported by the record; (3) his conduct with the Brannigans does not amount to violations of the Code; (4) the disciplinary proceeding was unfair because the standards provided by the Code are ambiguous; and (5) the conduct, if unprofessional, does not warrant disbarment as petitioned by the Committee. We agree with the findings and rulings submitted by the referee and disagree with respondent's due process and fairness arguments. We therefore order the respondent disbarred from the practice of law in the State of New Hampshire.

This case, unlike most disbarment proceedings, does not involve the breach of a fiduciary duty, where money belonging to a client has been misappropriated or stolen. It involves less tangible, but equally significant, ethical considerations, which lie at the heart of the relationship between attorney and client, as well as the role of the attorney as an officer of the court and the obligations of the legal profession to contemporary society. The practice of law involves the pursuit of a learned profession whose ethical considerations are set forth in the Code and in the Rules of

Professional Conduct which replaced the Code, effective February 1, 1986.

The respondent was admitted to practice as an attorney in New York in 1952 and in New Hampshire in 1967. He has maintained a general practice in New York City in the areas of wills, estates, small corporations, arbitration, appellate and space law. While he has never formally practiced law in New Hampshire, he has made his presence known to this court before. *See Wehringer v. Bullen*, 120 N.H. 446, 417 A.2d 1 (1980). In light of Wehringer's experience as an attorney, the record displays not only questionable professional judgment, but also blatantly unethical conduct committed by him during his involvement with the divorce and child custody dispute.

When a disciplinary action comes before this court, we address two issues. First, whether the record supports the findings and rulings of the referee, and second, what would be an appropriate sanction to impose against the respondent. *See Mussman's Case*, 111 N.H. 402, 286 A.2d 614 (1971). Because the nature of the attorney's actions is critical to our review of the referee's recommendation, we set forth in detail the facts describing Wehringer's conduct with the Brannigans.

The Brannigans were married on July 21, 1979. They lived together in Westchester County, New York, until they separated in March 1984. They have one child, J.D., who was born in January 1984. After the separation, John hired Arnold D. Cribari, of White Plains, New York, as his attorney, while Audrey hired Peter Bodner, also of White Plains, as her attorney. The New York family court originally granted Audrey custody of the child and gave John visitation rights. However, on March 21, 1984, the family court rescinded John's visitation rights until he underwent psychiatric evaluation because of reports of his violent behavior towards Audrey and their child. After formal divorce proceedings were initiated in May 1984, Audrey and J.D. moved to Lawrence, Massachusetts, to live with her parents. The Massachusetts district court granted Audrey's request for a restraining order prohibiting John from entering Audrey's residence in Lawrence.

Approximately six months prior to July 16, 1985, John Brannigan, who had been referred to Wehringer through the offices of a New York psychologist, asked the respondent to review his divorce files and to consider taking over his case. Wehringer agreed to review the files for a retainer fee of $2,500. From these files, Wehringer learned, or should have learned, that John and Audrey had been represented by attorneys since their separation; that

Audrey was granted sole custody of their child by the New York family court after reports revealed John's violent behavior towards Audrey and J.D., and that Audrey had obtained a restraining order against John from the Massachusetts district court.

After reviewing the files, which reveal a bitter, sometimes violent, drawn-out divorce litigation, Wehringer declined to represent John in the litigation; however, he instead offered his services as a "special counsel" to John to prepare a settlement agreement or stipulation to submit to Attorneys Bodner and Cribari. John agreed to hire Wehringer for the limited purpose of resolving the heated battle with a single agreement. For this, Wehringer charged an additional $2,500.

On June 15, 1985, Wehringer interjected himself in the divorce proceeding by sending a proposed agreement to Attorneys Bodner and Cribari with a letter explaining that he had been hired by John "for the purpose of seeking an end to the litigation between the parties . . . ." The proposed settlement was substantially different from the arrangement existing at the time. In short, the proposed agreement provided that John would have custody of the child and that Audrey would be responsible for child support payments. As could be expected, neither attorney gave any credence to the proposal. Moreover, Wehringer's interference led to Attorney Cribari's withdrawal as John's lawyer on July 17, 1985.

On July 16, 1985, John took the child custody battle out of the court into his own hands when he kidnapped J.D. from Audrey's custody. He drove to her residence in Lawrence, Massachusetts, assaulted her father, Edward Morse, grabbed the child from Morse's arms and drove away with him. Wehringer learned about the incident later the same day when Paul Brannigan, John's brother, called him to inform him about what John had done. While Paul did not call Wehringer to seek his legal advice, the respondent nonetheless told Paul that John had gotten himself into a difficult situation and that John should turn the child over to a neutral party and appeal to the court for leniency in dealing with his conduct.

Audrey, meanwhile, had contacted the police. Detective Kalil of the Lawrence (Massachusetts) Police Department responded to a call reporting the kidnapping and, after speaking to Audrey and her father about the reported incident and verifying the district court's restraining order, obtained warrants for John's arrest on two counts of assault, one count of violating the restraining order, and one count of parental kidnapping charged as a felony. Thereafter, Detective Kalil was assigned to work with Assistant

District Attorney Joseph B. Green, the Massachusetts State Police, and an FBI agent.

The police informed the New York family court of the kidnapping incident, and the court personnel advised that if John were "cornered" or felt that he was being "cornered," there was a possibility that he would injure the child. On July 19, three days after the kidnapping, Audrey received a telephone call from John in which he threatened to take the child out of the country if she did not follow his instructions. He demanded that she contact Wehringer and work out a settlement agreement and that she fire her attorney. In response to both the warnings and John's threatening phone call, the police decided to use any means available to return the child to Audrey safely, and advised Audrey to contact Wehringer about the settlement. The police obtained the family court's permission for Audrey to go through the pretense of signing the agreement without intending it to be binding.

On July 20, in accordance with the plan, Audrey called the respondent and informed him that John had threatened to take the child out of the country if she did not sign an agreement with him. Knowing that Audrey was calling him under duress and that John had violated court orders by kidnapping the child, Wehringer nonetheless agreed to work out a settlement agreement for John and Audrey. In order to discuss the terms of the agreement in an orderly fashion, Audrey suggested that they use Wehringer's earlier proposal as a guide. Over the course of several phone calls with Audrey and with one of John's intermediaries (either his brother Paul or John's girl friend, Sonya), Wehringer changed the settlement agreement extensively, so that Audrey would have custody of J.D., John would have visitation rights every other weekend, and John would provide child support.

On July 23, Wehringer sent a letter to Audrey outlining the plans for signing the settlement agreement. According to the plan, Wehringer would send copies to John's intermediaries for his signature, and he would meet Audrey in a parking lot off a main highway in Lawrence. Wehringer also expressed in this letter his "fear" that Audrey would sign the agreement and then "renounce the agreement as signed under duress and seek to put [her] husband behind steel bars . . . . What he did was, as I understand it, a violation of court orders, though I'm certain a father has feelings for seeing his child too." He concluded by saying that if she did renounce the agreement, then he would "feel used, taken advantage of; whatever."

On July 26, Wehringer met Audrey in an agreed-upon parking lot near Denny's Restaurant in South Lawrence, Massachusetts. Audrey arrived with Detective Kalil, who posed as a friend, and a notary public. Wehringer arrived with a copy of the settlement agreement signed by John. Audrey reviewed the signed copy and questioned some modifications made by John. According to the testimony of Detective Kalil, Wehringer replied to her questioning by saying that John's position was that if she did not sign the paper, she would never see the baby again. He then picked up the papers and walked towards his car. Audrey begged Wehringer not to leave, and agreed to sign the stipulation, which provided that the terms would not be effective unless J.D. was returned to Audrey by 9:00 a.m. on July 27. They left the parking lot without making definite plans about the return of the child, except that Wehringer was expecting a phone call from John's intermediary. He said he would notify her after he received the call.

John finally called Audrey at approximately 11:30 a.m. on the following day and arranged to meet with her in the parking lot of a shopping mall in Enfield, Connecticut. The scheduled meeting ended with a police chase, John's attempt to break away with J.D., a forceful removal of the baby from John's car by the police, and the ultimate return of J.D. to Audrey.

Wehringer's involvement with the Brannigans did not end with the return of the child. By letter dated July 27, the day the child was returned, Wehringer asked Audrey whether the agreement was still in force if the child was not returned by 9:00 a.m. Moreover, on November 1, the respondent filed the agreement with the Supreme Court, Westchester County, New York, for instructions on its validity.

Throughout the period during which Wehringer worked with the Brannigans, the respondent sent statements outlining the charges for his services to John alone. The respondent sent five statements between July 17 and December 2, charging John $13,639 for, among other things, the review of the files and preparation of the settlement agreement, the modification of the agreement, the letters and phone calls to Audrey, the meeting with Audrey in Lawrence, the preparation of motion papers to the Supreme Court, Westchester County, and a "letter to Massachusetts attorneys as to possible grounds for vindication of John's actions in forcing visitation with the child of the marriage." The statements which were sent on October 21 and December 2 waived the fees for work relating to the filing of the settlement agreement with the Supreme Court, Westchester County.

Notice of Wehringer's conduct with the Brannigans reached the Committee on Professional Conduct when Massachusetts Assistant District Attorney Green filed a complaint against the respondent. A hearing was held on the complaint before the Committee on October 15, 1986. After the hearing, the Committee filed with this Court a petition for disbarment, presenting detailed findings of facts from which it determined that the respondent had violated the following eight disciplinary rules under the New Hampshire Code of Professional Responsibility, in effect prior to February 1, 1986:

"a) DR 1-102(A)(1) by violating a Disciplinary Rule.

b) DR 1-102(A)(4) by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

c) DR 1-102(A)(5) by engaging in conduct that is prejudicial to the administration of justice.

d) DR 1-102(A)(6) by engaging in other conduct that adversely reflects on his fitness to practice law.

e) DR 5-105(A) by failing to decline proffered employment when it was likely to involve him in representing differing interests.

f) DR 7-102(A)(7) by assisting his client in connection with conduct he knew to be illegal or fraudulent.

g) DR 7-102(A)(8) by knowingly engaging in other illegal conduct or conduct contrary to a Disciplinary Rule.

h) DR 7-104(A)(1) by communicating on the subject of the representation with a party he knew to be represented by a lawyer in that matter, without prior consent of the lawyer representing such other party."

In accordance with Rule 37(13)(b) and (c), this court served notice on the respondent requesting that he "file an answer within 30 days after service . . . showing cause why he should not be disbarred from the practice of law as requested by the Committee's petition." Wehringer filed an answer admitting certain facts, but denying all allegations of violations of disciplinary rules. On May 4, 1987, this court appointed Justice Bois to hear the case and make findings of facts and rulings of law. The hearing was held on June 10 and 12, 1987. Testimony was given by Edward Morse; Audrey Brannigan; the respondent; Detective Kalil; Paul Brannigan; and William Golden, a psychologist who testified on behalf of respondent.

The referee made findings of fact, under a standard of clear and convincing evidence, and concluded that the respondent had violated each disciplinary rule, as alleged in the petition. *Edes' Case*, 118 N.H. 815, 395 A.2d 498 (1978). In summary, the referee found that Wehringer acted as a "special counsel" for John Brannigan without consulting John's attorney of record. The referee found also that while "the respondent did not know of, participate in or condone" John's kidnapping the child, the respondent did participate in negotiating the settlement agreement, knowing that John had violated court orders and that Audrey was acting under duress. Moreover, the respondent not only prepared the agreement without seeking the permission of Audrey's attorney, but also spoke disparagingly of him and encouraged her to fire her attorney. The referee noted that, although the respondent insisted that he was a mediator and not John's attorney, the respondent's bills to John, as well as his representation on behalf of John after the child was returned to Audrey, clearly establish that the respondent was acting on John's behalf.

■ Following the receipt of Justice Bois's report, we ordered briefing and oral argument. During this stage of the disbarment proceeding, the respondent's motion to file his own brief and to argue orally, *pro se*, was granted. In his brief, the respondent claims that he was denied the right to have a lawyer appointed by the court. Because the record does not reflect that the respondent has ever requested that a lawyer be appointed, and because he informed this court during oral argument that he preferred to proceed *pro se*, we hold that the respondent effectively waived any claims with respect to a right to court-appointed counsel.

The respondent disputed certain findings made by the referee and gave an entirely different account of his involvement with the Brannigans. Wehringer claims that after he finished his role as a "special counsel" on behalf of John, he never represented either party as an attorney, but rather provided services as a mediator or a "Dutch uncle." Moreover, contrary to other testimony, he maintains that he neither threatened nor pressured Audrey to agree to the settlement agreement, because he included only the terms she proposed to him. Finally, he argues that he did not communicate with Audrey while she was represented by another attorney because she told him that she had fired her attorney.

■ Throughout his brief and during oral argument, the respondent asked this court to review the recordings of telephone conversations between Audrey and the respondent, taped by

716

Audrey, and to judge for ourselves whether the respondent committed any misconduct. Review by this court of a referee's findings in a misconduct case does not provide an attorney with a *de novo* trial. It is not our role to substitute our own findings for the judgment of the referee. Instead, we make a determination on whether a reasonable person could find as the referee did. *Edes' Case*, 118 N.H. at 817, 395 A.2d at 499. In other words, we determine whether the facts, as found by the referee, are consistent with the record.

While the respondent testified that he was not hired by John to act as a mediator, Audrey testified that Wehringer told her that he was being retained by John and that John was paying the bills. The record also shows that Wehringer billed John $8,450 for professional services "upon a top-priority basis, attention given to the drafting-modification of an agreement," and $2,250 for professional services in the "continuing problem between John D. Brannigan and Audrey Morse Brannigan, subsequent to signing by both parties a settlement agreement." Wehringer attempts to minimize the relevance of the bills sent to John by explaining that he did not send the bills to Audrey because it was obvious at the time he sent the bills .that she was not going to uphold the agreement. The respondent's actions do not support his words. The charges for the settlement modification are made in the same statement as the unpaid fees for his services as a "special counsel," as well as his services on behalf of John subsequent to the return of the child to Audrey's custody. If an attorney is performing two different services for different clients, it is highly unlikely, and certainly unprofessional, that he or she would keep records of such services under one account. The record clearly supports the finding that Wehringer acted as John Brannigan's attorney during his role as "mediator."

 In rebuttal to the referee's finding that the respondent "was aware and recognized at all times that [Audrey] was acting under duress," Wehringer argues that he never threatened Audrey during the negotiation process. In fact, he contends that he was protecting her interests by advising Audrey that if she was signing the agreement under duress, the settlement agreement would not be binding. Yet, both Audrey and Detective Kalil testified that when Audrey met Wehringer to sign the agreement, Wehringer threatened to drop the whole settlement matter if Audrey did not sign the agreement as it was drawn up. The issue falls on the credibility of the witnesses; "[c]redibility as well as weight given to testimony is a question of fact for the [trial] court and if the

findings could reasonably be made on all evidence they must stand." *Edes' Case supra* (quoting *Gordon v. Gordon*, 117 N.H. 862, 865, 379 A.2d 810, 813 (1977)).

If the respondent was aware that Audrey could be signing under duress, then he certainly was aware that, under such conditions, Audrey was not legally capable of agreeing to the terms of the settlement agreement. Yet, the respondent continued to negotiate the settlement under the stressful circumstances surrounding Audrey. Such actions can not be justified on the ground that the respondent was merely playing the part of a naive mediator following the instructions of a desperate party. We find the referee's findings to be consistent with the record, and therefore uphold them.

The respondent also argues that he was "framed" by Audrey and the police while he was negotiating a settlement with Audrey because she informed him that she had fired her attorney. The record shows that Audrey worked in cooperation with Detective Kalil, a Massachusetts assistant district attorney, the Massachusetts State Police and an FBI agent without informing the respondent. Audrey testified that during the course of the second telephone conversation, Wehringer spoke disparagingly of Attorney Bodner's work, claiming that he pushed John into the kidnapping situation, and expressed his concern that Attorney Bodner would advise Audrey to renounce the agreement. Audrey also testified that during the next telephone call, Wehringer informed her that he called John's former attorney and learned that Attorney Bodner was still her attorney of record and told her "to get rid of Bodner." As the record reflects, Audrey did not discharge her attorney from further services, and she never intended to discharge him. Nonetheless, based on the testimony concerning Wehringer's behavior towards Audrey's attorney, the referee properly found that "the respondent at no time sought permission of [Audrey's] legal counsel . . ." and that "[h]e was not complimentary as to [her counsel's] methods and on several occasions encouraged [Audrey] to dismiss him as her representative." The respondent's lack of knowledge concerning the involvement of the police does not excuse his conduct following Audrey's initial phone call.

In addition to disputing certain findings of fact, the respondent also contests the referee's rulings on the violations of the disciplinary rules. He argues that, because his objectives throughout the negotiation process were to achieve the well-being of the child and to end the "divorce warfare," his conduct could not be considered to violate the disciplinary rules.

As is the case with the referee's findings of fact, our role with respect to the findings of rule violations is simply to determine whether such findings are consistent with the record. The record reflects that the referee properly found that the respondent violated the eight disciplinary rules as enumerated in the petition for disbarment. Wehringer argues that he was acting as a mediator between John and Audrey. The record, however, shows that the respondent's "mediation" involved representing parties with conflicting interests, interfering with litigation between two parties represented by other attorneys, negotiating a divorce and custody agreement with terms in violation of court orders, and communicating with an opposing client without her attorney's permission. Wehringer argues that his advice to Audrey that she could revoke the settlement agreement minimizes the conflict of interest and violation of court orders problems. Moreover, he contends that he did not communicate with Audrey without her attorney's permission because she had told him that she had fired her attorney. Wehringer justifies his conduct by insisting that he was protecting Audrey's interests and following her instructions. This court recognizes that "an attorney has a duty to protect the interests of a client"; however, "the legal and ethical methods of performing this duty are solely the responsibility of the attorney." *Mussman's Case*, 111 N.H. at 411, 286 A.2d at 619. "The attorney cannot escape . . . responsibility with the excuse that he is only following the instructions of his client or that it was the client who sought advice on how to accomplish a questionable transaction." *Broderick's Case*, 104 N.H. 175, 178, 181 A.2d 647, 649 (1962).

The seriousness of unprofessional conduct is not necessarily determined solely by the number of rules broken or by which rules were violated. Rather, the seriousness of unethical behavior is determined largely with reference to the attorney's behavior. Here, the respondent's conduct in the parking lot, where he used John's threat to take the child out of the country to coerce Audrey into signing the settlement agreement, sufficiently reflects how serious his ethical violations were.

We now turn to the final issues, which are: (1) whether the disciplinary proceeding was fair and (2) whether the respondent's conduct warrants disbarment. This court has inherent authority as well as statutory authority to discipline attorneys. *See Barnard's Case*, 101 N.H. 33, 34, 131 A.2d 630, 630–31 (1957) ("This court has the inherent power to take reasonable and expeditious actions in the suspension or removal of members of the bar for the protection

of the community."); RSA 311:8; *see also* SUP. CT. R. 37(13)(f) ("The court may suspend, disbar or publicly censure respondent attorney upon such terms and conditions as the court deems necessary for the protection of the public and the preservation of the integrity of the legal profession."). We are charged with the responsibility to assure the public that attorneys are fulfilling their duties as members of the legal profession. The courts have the authority to remove attorneys because it is

> "necessary, 'not as a mode of inflicting a punishment for an offense, but in order to enable the courts to prevent the scandal and reproach which would be occasioned to the administration of the law by the continuance in office of those who had violated their oath or abused their trust, and to take away from such persons the power and opportunity of injuring others by further acts of misconduct and malpractice.'"

*Ricker's Petition*, 66 N.H. 207, 212, 29 A. 559, 561 (1890) (quoting *Randall's Petition*, 11 Allen 473, 479, 480 (1865)).

New Hampshire bar members are expected to conduct themselves at "all times in conformity with the standards imposed . . . as conditions for the right to practice law." SUP. CT. R. 37(1)(b). The Code of Professional Responsibility, adopted by this court in 1974 (replaced by Rules of Professional Conduct, effective February 1, 1986), provides the attorneys with ethical standards. The respondent argues in his brief that the disbarment proceeding was unfair because it did not provide the attorney with any guidelines, as to "what acts, what omissions should warrant what penalties."

The respondent fails to understand what it means to be a member of the legal profession. It is a profession where one "seeks to avoid even the appearance of impropriety" and, thus, strives to live by a higher standard of conduct than a layperson. *See In re Hinds*, 90 N.J. 604, 631, 449 A.2d 483, 498 (1982). The duty to "avoid even the appearance of impropriety" is not one to be taken lightly because "[a]ttorneys 'constitute a profession essential to society. Their aid is required not merely to represent suitors before the courts, but in the more difficult transactions of private life. The highest interests are placed in their hands and confided to their management. The confidences which they receive and the responsibilities which they are obliged to assume demand not only ability of a high order, but the strictest integrity.'" *Ricker's Petition, supra* at 250, 29 A. at 581 (quoting *Randall v. Brigham*, 74 U.S. 523, 540 (1868)).

■ Although the language of the code provisions may appear to be written broadly, one must remember that these rules were "written by and for lawyers." *In re Keiler*, 380 A.2d 119, 126 (D.C. 1977). "The language of a rule setting guidelines for members of the bar need not meet the precise standards of clarity that might be required of rules of conduct for laymen." *Id.*

■ The canons of professional ethics were first approved by the American Bar Association in 1908, at which time the population of New Hampshire was slightly less than 430,000. *See generally* C. WOLFRAM, MODERN LEGAL ETHICS § 2.6.2, at 53 (1986). Since then the State's population has increased by approximately 150%, and the number of practicing attorneys has increased from 425 to approximately 3,000, or by 600%. With changing public attitudes and increasing resort to the judiciary for the resolution of disputes, the role of lawyers in the affairs of people has become both increasingly important and increasingly visible. This interaction between the members of the bar and the citizenry it serves has been intensified by technological changes in communication and record-keeping. It follows that in the context of the times in which we live, the significance of the ethical rules has become sharpened, and their underlying message, that the relationship of the lawyer to the client and the court is one of fiduciary underpinnings, has become equally intensified. The relationship of the lawyer to the client and the court is not determined by the rules governing the activities of the market place, but is determined by the higher standards provided in the Code and Rules. In related matters not involving lawyers, this court has held that a commercial bank owes a fiduciary duty to a borrower in dispersing the proceeds of the loan, *Lash v. Cheshire County Savings Bank*, 124 N.H. 435, 474 A.2d 980 (1984); that trustees of a mutual savings bank owe a fiduciary duty to its depositors when the bank's assets are sold, *Appeal of Concerned Corporators of Portsmouth Sav. Bk.*, 129 N.H. 183, 525 A.2d 671 (1987); that a real estate agent under most circumstances occupies a position of trust and confidence and owes an obligation of undivided loyalty, a relationship like that of a lawyer to a client and a trustee to a beneficiary, *Crowley v. Global Realty, Inc.*, 124 N.H. 814, 474 A.2d 1056 (1984); that the duty of good faith and due diligence of a mortgagee in conducting a foreclosure sale of real estate is "essentially that of a fiduciary," *Murphy v. Financial Development Corp.*, 126 N.H. 536, 495 A.2d 1245 (1985); and that a fiduciary duty exists when a person acts pursuant to a general power of attorney, *In re Estate of Ward*, 129 N.H. 4, 523 A.2d 28 (1986) (although the defendant in this case was

an attorney, it is not necessary for an individual to be an attorney to act under a general power of attorney).

A lawyer, because he or she is a member of a learned profession governed by a code of conduct reflecting human experience, may not be permitted to have ethical conduct measured against a lesser standard than that which this court has recently applied to others. The affairs of fiduciaries are viewed by this court against a narrow gauge. The record in this case amply supports the view that the respondent's conduct in the affairs of the Brannigans failed to rise to the level of the minimum standards of lawyer conduct set forth in the Code of Professional Responsibility.

"In determining the discipline to be imposed in a given case, this court must consider mitigating factors." *Eshleman's Case,* 126 N.H. 1, 6, 489 A.2d 571, 574 (1985) (citing *Mussman's Case,* 111 N.H. at 412, 286 A.2d at 620). In this case, however, there are no mitigating factors. Good intention will not substitute for the requirement of competence, and it will not "preclude disbarment." *See Eshleman's Case supra.* Wehringer professes to believe, as he argued before this court, that his conduct was permissible. The referee found, and this court agrees, that such a position leads to no other conclusion but that Wehringer is unfit to practice law. We therefore order Cameron K. Wehringer disbarred.

*So ordered.*

All concurred.