Original
No. 85-433

WOICCAK'S CASE

July 13, 1989

*Bruce W. Felmly*, of Manchester, by brief and orally, for the Committee on Professional Conduct.

*Tardif, Shapiro & Cassidy*, of Concord (*R. Peter Shapiro* on the brief and orally), for the respondent.

BROCK, C.J. The Supreme Court Committee on Professional Conduct (committee) brings this petition to disbar Edward R. Woiccak from the practice of law in New Hampshire. *See* SUP. CT. R. 37(3)(C) and (13).

The respondent is a member of the New Hampshire Bar and was a partner in the Hampton law firm of Shepcaro, Woiccak and McNeil (S, W & M) from May, 1983, until September, 1985. In August, 1985, a former client of S, W & M lodged a complaint with the committee which resulted in an investigation of the law firm's records and trust accounting procedures. Following an examination

of client and operating accounts by a court-appointed certified public accountant, and a subsequent hearing before the committee, the committee petitioned this court for the immediate suspension of the respondent. The petition was granted on September 20, 1985. On April 1, 1986, the committee petitioned the court for disbarment of the respondent. The case was referred to a Referee (*Theodore Wadleigh*, Esq.) for an evidentiary hearing and the filing of a written report with findings of fact and rulings of law. After a three-day hearing and the submission by both parties of requests for findings of fact and rulings of law, the referee found, by clear and convincing evidence, that the respondent had violated Code of Professional Responsibility Rules DR 1-102(A)(1), DR 1-102(A)(4) and (6), DR 7-101(A)(3), and DR 9-102(A), B(3) and (4), as well as Supreme Court Rule 50. The referee recommends that the committee's petition for disbarment be granted.

According to the referee's findings, the following events occurred. In May, 1983, the partners established the law firm of Shepcaro, Woiccak and McNeil. Respondent's partners, Marc J. Shepcaro and Robert F. McNeil, were not members of the New Hampshire Bar but were admitted to practice in Massachusetts. Pursuant to the partnership agreement, they agreed that Robert F. McNeil would act as managing partner. Operating accounts and client trust accounts were established in New Hampshire and Massachusetts, with all partners having signatory authority. Although McNeil had primary responsibility for maintaining the New Hampshire accounts and kept the account books in a locked cabinet in his office, and at his residence, the referee found that the respondent was never denied access to the account records. The referee also found that McNeil signed the great majority of checks drawn on the New Hampshire client trust account, but that the respondent drew thirty-three checks on this account between January 1, 1984, and April, 1985. In spite of his initial denial to the committee, the respondent now agrees that he drew the checks.

On May 10, 1985, McNeil, in the respondent's absence, represented one of the respondent's clients, Thomas Kady, at a closing upon which $71,737.43 in net proceeds belonging to Mr. and Mrs. Kady were deposited into the client trust account. When Mr. Kady went to the firm four days later to request the proceeds, the respondent asked McNeil to draw a check from the client trust account. The respondent admits that at this time McNeil informed him that there might be a problem with the client trust account. His response to McNeil was that there should have been sufficient funds in the account, since over $70,000 had been deposited in the

account on May 10. He further stated that, if there was a problem, McNeil should inform the client; otherwise, he should draw the check. McNeil drew a check for $60,000 which was subsequently dishonored for insufficient funds. With the aid of new counsel, Mr. Kady later received three cashiers' checks of $20,000 each. In order to reimburse Kady, the respondent had to borrow funds from various sources. The referee found that, at least by this time, the respondent knew that the client trust account was out of trust. He further found that there was no accounting for the $11,737.43 remaining as a balance from the proceeds of the closing. The firm allegedly retained these funds as attorney's fees.

Subsequent to the Kady incident, the respondent took no steps to investigate the status of the client trust account, to remedy the fund shortage problem, or to change the accounting procedures. His own testimony revealed that from the inception of the law practice in May, 1983, until its demise, he did not examine the client trust account records to determine whether they were being maintained properly.

On August 30, 1985, Dennis Stone, the certified public accountant acting on behalf of the committee, visited the firm to investigate whether its records complied with Supreme Court Rule 50, which governs the maintenance of client trust accounts, to look generally at the financial condition of those accounts, and to obtain a Trust Accounting Compliance Certificate in compliance with Rule 50.

Supreme Court Rule 50(2) requires in pertinent part that:

> "[E]very attorney or the firm organization shall maintain a trust accounting system that shall include at the minimum, (1) a ledger or system showing all receipts and disbursements from the trust account or accounts with appropriate entries identifying the source of the receipts and the nature of the disbursement, and (2) a separate accounting page or columns for each client for whom property is held, which shall show all receipts and disbursements and carry a running account balance. Any other system that preserves the above-mentioned features and sufficiently accounts for trust funds may also be used. In addition there shall be maintained an index, or equivalent single source for identification of all trust accounts. . . ."

The rule also provides that "[a]ll cash property of clients received by attorneys shall be deposited in one or more clearly designated trust accounts (separate from the attorney's own funds) in financial institutions."

According to Stone's testimony, his investigation revealed the following violations. The law firm failed to maintain a proper ledger system of receipts and disbursements, and failed to maintain an index of client trust accounts. Stone's analysis of money deposited in and withdrawn from the client trust account indicated that from May, 1983, to August, 1985, over $1.2 million was deposited into the account and over $1.4 million was disbursed from it, none of which was recorded in the client trust account records. Thus, there was insufficient information to trace the funds in the account to a particular client and to determine whether or for what purpose funds had been disbursed to that client. Stone concluded, and the referee found, that approximately 40–45% of the law firm's trust account transactions were never recorded. In fact, the referee found that when Stone requested the firm records, he received only an incomplete collection of bank statements and check stubs; he did not receive any individual client accounts, trust cards, a journal ledger, or other documents required for a properly maintained client trust account. Moreover, when Stone advised the respondent that he would have to complete and file the Annual Trust Accounting Compliance Certificate pursuant to Rule 50, the respondent filed an incomplete statement which, if completed, would have shown that the firm was not in compliance with the rule. The referee found that "[n]ot only was Supreme Court Rule 50 not complied with, no attempt was made by the Firm to comply." In addition, the referee found that client trust funds were used to pay the operating expenses of the firm. "Mr. Woiccak has deliberately and knowingly, in spite of his protestations to the contrary, misappropriated and converted client funds by an unauthorized use of client funds entrusted to his firm. . . ."

A further illustration of the misuse of client funds occurred in August, 1985, when the respondent's law firm represented Arthur Kennison in a real estate transaction. After closing, the firm deposited approximately $170,000 in the client trust account, representing the net proceeds of the sale of the client's condominiums. The firm was to use that money to discharge a $77,000 second mortgage, and to remit the remaining $100,000, to Kennison. The firm paid Kennison approximately $100,000, but never discharged the second mortgage. To avoid personal liability, Kennison had to pay the second mortgage from the $100,000 proceeds. The referee found that at the time Kennison discharged the second mortgage, the client trust account held less than $500 and that the "funds which should have been disbursed to the bank to discharge the second mortgage were in fact disbursed to other clients from the

client trust account . . . to cover shortages in the client trust account." Kennison never recovered the $77,000 which he had entrusted to S, W & M.

On appeal, the respondent does not challenge the finding that his actions subject him to disciplinary sanctions. Rather, he argues that the nature of his participation does not warrant permanent or indefinite prohibition from the practice of law. He requests that he be permitted to reapply for admission and that, if an investigation of his character and activities since the date of his suspension proves satisfactory, he be admitted to practice on a full or probationary basis.

The obligation of this court to impose disciplinary sanctions "for the protection of the public, the maintenance of public confidence in the bar as a whole, and the prevention of the recurrence of similar conduct," is taken very seriously. *See Mussman's Case*, 111 N.H. 402, 412, 286 A.2d 614, 620 (1971). We are empowered either to suspend or to disbar an attorney "as necessary to protect the public and the integrity of the legal profession." *Eshleman's Case*, 126 N.H. 1, 3–4, 489 A.2d 571, 572 (1985); *see* RSA 311:8. In *Connolly's Case*, we expressed our view that the general rule in cases involving the misuse of a client's funds is disbarment. *Connolly's Case*, 127 N.H. 786, 791, 508 A.2d 1054, 1057 (1986). Although we have recognized that this court's response to the misuse of a client's funds has not been uniform, *id.* at 790, 508 A.2d at 1057, since 1985, we have uniformly held that misuse of such funds should result in disbarment, *id.*, and it has long been established that "any use of the client's money by the attorney for his own advantage is a breach of trust which cannot be tolerated." *Allen's Case*, 75 N.H. 301, 302, 73 A. 804, 804 (1909); *see also Eshleman's Case, supra* at 4, 489 A.2d at 573 (quoting *Wholey's Case*, 110 N.H. 449, 450, 270 A.2d 609, 610 (1970)), and that the misappropriation of that money "demonstrates such lack of common honesty as to clearly justify an attorney's disbarment." *Eshleman's Case, supra* at 4, 489 A.2d at 573 (quoting *Harrington's Case*, 100 N.H. 243, 244, 123 A.2d 396, 396 (1956)).

The referee found that the committee had proved by clear and convincing evidence that the respondent violated the following: (1) DR 1-102(A)(1) (violation of a disciplinary rule); (2) DR 1-102(A)(4) (fraudulent and dishonest conduct); (3) DR 1-102(A)(6) (conduct reflecting adversely on respondent's fitness to practice law); (4) DR 7-101(A)(3) (prejudice or damage to client); (5) DR 9-102(A), (B)(3), (B)(4) (preservation of identity of client funds,

maintenance of complete and accurate records, appropriate accounting, prompt payment of client funds); and (6) Supreme Court Rule 50, section (2) (maintenance of adequate trust accounting system). The standard of review in this case requires us to determine " 'whether a reasonable [person] could have reached the same decision as the [referee] on the basis of the evidence before him.'" *Edes' Case*, 118 N.H. 815, 817, 395 A.2d 498, 499 (1978) (quoting *Sargent Lake Association* v. *Dane*, 118 N.H. 720, 722, 393 A.2d 559, 561 (1978)). We see no error in the referee's findings. Nor do we believe that the respondent has advanced any arguments or presented sufficiently mitigating circumstances to warrant an exception to the general rule of disbarment.

The respondent asserts that he had no actual knowledge that clients' funds were being used for unauthorized purposes, and that it was McNeil's responsibility, not his, to maintain the client trust accounts. He also contends that the referee erroneously considered the testimony of Robert McNeil in rendering his decision. We reject both arguments. First, there was ample evidence in the record to support a finding that the respondent knew the client trust accounts were out of trust and in violation of Rule 50, and that funds were being converted to use for unauthorized purposes, at least from the time of the Kady transaction. The respondent admits that after the Kady incident, in May, 1985, he took no remedial action whatsoever, nor did he even investigate the state of the client trust accounts.

Second, we refuse to credit willful or negligent blindness as a mitigating circumstance which would justify a more lenient sanction. The respondent had the responsibility as a fiduciary, and particularly as the only partner licensed to practice law in this State, to ensure that the integrity of client trust accounts was being maintained. This is the purpose of the trust accounting compliance certificate, which the respondent was unable to complete in 1985. Furthermore, we dismiss the respondent's argument that the testimony of McNeil should not have been accorded any weight because his conduct allegedly violated the rules of this court and various criminal laws. However, McNeil's character should have caused respondent greater concern as a law partner than in his role as a witness. The referee had the discretion to determine McNeil's credibility, as well as the weight given to his testimony. *Wehringer's Case*, 130 N.H. 707, 716–17, 547 A.2d 252, 257 (1988); *Edes' Case*, *supra* at 817, 395 A.2d at 499. Moreover, we agree with the referee's statement that McNeil's testimony was not necessary to a finding that the respondent "knew of the status of the client trust account, knew that it was out of trust, and not only took no steps to bring

it back into trust, but continually used the client trust account for impermissible purposes."

The respondent also claims as a defense to disbarment that the twelve-and-one-half-month delay between the evidentiary hearing and the referee's decision violated his constitutional right to due process. Specifically, the respondent contends that the delay violated the principle of essential fairness because the referee could not accurately assess the credibility of witnesses one year after hearing their testimony. Although undue delay may, in some instances, necessitate a new hearing, we are not persuaded that the respondent's due process rights were violated in this case. The result in this case rests less upon the credibility of certain witnesses than on the proof of objective facts proved by the firm's records, or lack of them, as well as his own testimony concerning his inattention to the client trust account problems. Furthermore, uncontested evidence and the disinterested testimony of Stone support the referee's findings. The referee made over two hundred findings of fact and rulings of law and a fifteen-page decision which was thorough and well reasoned. After a review of the record, we agree with the referee's findings and conclusions. Indeed, as we noted above, even the respondent agrees that his conduct subjects him to disciplinary sanctions. Furthermore, the respondent made no motion, for a new trial or other relief, protesting the delay. We find no violation of due process. We therefore grant the committee's petition. Edward R. Woiccak is hereby disbarred.

*So ordered.*

THAYER, J., did not participate; the others concurred.