Original
No. LD-96-011

NARDI'S CASE

February 24, 1998

604

*Ouellette, Hallisey, Dibble & Tanguay, P.A.*, of Dover (*Stephen J. Dibble* on the brief and orally), for the committee on professional conduct.

*Richard G. Smith*, of Keene, by brief and orally, for the respondent.

BRODERICK, J. The Supreme Court Committee on Professional Conduct (committee) filed a petition seeking disbarment of the respondent, Vincent J. Nardi, II. *See* SUP. CT. R. 37(13)(a). The Judicial Referee (*Temple*, J.) found by clear and convincing evidence that the respondent violated Rules of Professional Conduct (Rules) 1.15(a)(1), 1.15(c), 4.1(a), 8.4(a), and 8.4(c), and recommended suspension as a sanction. The respondent does not challenge either

the referee's rulings that he committed numerous ethical violations or the findings of fact which support those rulings, but urges a brief period of suspension. The committee recommends disbarment. We order the respondent disbarred.

The ethical violations at issue arose from two separate transactions. In the first transaction, the respondent represented Alternate Development Group, Inc. (ADG), a real estate development company. In July 1993, ADG executed a purchase and sale agreement with John and Sharlene Turlis for the sale of a residence at Mammoth Hallow Condominiums in Manchester. The agreement required the respondent, as seller's attorney, to hold the Turlises' $1,750 deposit in escrow. Sharlene Turlis, in fulfillment of her obligation, executed two checks payable to the respondent. Upon receipt and without permission, the respondent endorsed the checks and promptly gave them to Robert Stewart, an incorporator and director of ADG, for payment of unspecified project costs. Ultimately, the Turlis sale was not completed and they sought the return of their deposit. When neither the respondent nor Stewart returned the deposit, Pattu Kesavan, the president and director of ADG, satisfied the obligation from personal funds. While the respondent asserted that ADG routinely used escrow deposit monies on prior occasions for project costs, the referee found no evidence of this practice, nor any evidence of the purchasers' consent or knowledge. Because the purchase and sale agreement and the Rules required the respondent to hold and safeguard the deposit, the referee found that the respondent violated Rules 1.15(a)(1) and 1.15(c).

In the second transaction, the respondent introduced his client, Kesavan, to another client, Bernard McLaughlin, a convicted felon, and the two engaged in joint business activities. Specifically, Kesavan twice loaned money to McLaughlin under promissory notes prepared and witnessed by the respondent to allow McLaughlin to purchase automobiles. When McLaughlin resold the vehicles at a profit, he discharged the loans and also paid Kesavan a portion of his gain. Without the respondent's involvement, a third loan was made for a similar purpose in which McLaughlin borrowed $21,500 from Kesavan with the understanding that he pay back $24,500. McLaughlin paid as promised, but his check was dishonored for insufficient funds.

Subsequently, McLaughlin arranged to meet Kesavan at the respondent's office to discuss repayment. Prior to the meeting, McLaughlin requested the respondent's help in holding off Kesavan and represented that he would have money for repayment in a few days. The referee found that when Kesavan arrived, the respondent

"misrepresented to Kesavan where his money was and misled him as to when it would be available." In fact, in a January 10, 1994, letter to Kesavan, the respondent expressly "apologize[d] for misleading [Kesavan] when [McLaughlin] asked that [the respondent] fabricate a story in order to buy him time with which to repay [Kesavan]." In addition, in a letter to the committee, the respondent admitted that he told Kesavan that "these funds were available" and were "in [his] possession," believing that he would receive the funds from McLaughlin in a few days.

The referee found that the respondent's misrepresentations to Kesavan violated Rules 4.1(a) and 8.4(c). The referee also found that the respondent violated Rule 8.4(a) by violating provisions of the Rules of Professional Conduct. The referee recommended suspension rather than disbarment "in view of the fact that there has been no showing of a prior disciplinary record."

██ When determining whether to impose the ultimate sanction of disbarment, we focus not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar conduct in the future. *See Basbanes' Case*, 141 N.H. 1, 6, 676 A.2d 93, 96 (1996) (quotation omitted); *Jones' Case*, 137 N.H. 351, 360, 628 A.2d 254, 259 (1993) (quotation omitted). We consider both the severity of the misconduct and the mitigating circumstances established by the record. *See Henderson's Case*, 141 N.H. 805, 810-11, 694 A.2d 973, 976-77 (1997).

██ "[T]he privilege of practicing law does not come without the concomitant responsibility of truth, candor and honesty." *Basbanes' Case*, 141 N.H. at 7, 676 A.2d at 96 (quotation omitted). An attorney's misuse of funds entrusted to him "demonstrates such lack of common honesty as to clearly justify an attorney's disbarment." *Woiccak's Case*, 131 N.H. 735, 740, 561 A.2d 1049, 1052 (1989) (quotation omitted); *see Connolly's Case*, 127 N.H. 786, 790, 508 A.2d 1054, 1057 (1986). In addition, because "[n]o single transgression reflects more negatively on the legal profession than a lie," attorney misconduct involving dishonesty also justifies disbarment. *Budnitz's Case*, 139 N.H. 489, 492, 658 A.2d 1197, 1199 (1995) (quotation omitted); *see Astles' Case*, 134 N.H. 602, 606, 594 A.2d 167, 170 (1991).

██ With regard to the first transaction, the respondent's transfer of the escrow funds to Stewart, a director of the respondent's client corporation, not only contravened the Rules but also violated

the express escrow agreement. The respondent's alleged prior practice of routinely giving escrow funds to ADG to offset its costs would not demonstrate his good faith in the Turlis transaction considering that, in the present case, the respondent did so without the consent or knowledge of the buyers. Admittedly, the respondent did not appropriate the escrow funds for his personal use. He did, however, knowingly violate the express terms of an escrow agreement by relinquishing control of funds expressly given to him for safekeeping. He did so without the knowledge or consent of the buyers. He possessed no right to transfer the funds as he did and in so doing violated his duties as a fiduciary.

Although the respondent explained his conduct, he could not justify it. The escrow transaction in which the respondent was involved was not complex, subtle, or uncertain. He took money belonging to a third person, entrusted to him, to which he had no legal right or interest, and gave it to another for purposes unauthorized and undefined. Ethical lawyering demands much more prudence and integrity.

■ With regard to the McLaughlin transaction, the respondent asserts that his statements to Kesavan concerning the location and availability of the $24,500 were not lies. The record reveals, however, that the respondent knowingly made false statements to Kesavan in an effort to "buy time" for McLaughlin. See Henderson's Case, 141 N.H. at 809, 694 A.2d at 976 (defining intentional misrepresentation). The referee found that the respondent "misrepresented to Mr. Kesavan as to where his money was and misled him as to when it would be available." This misrepresentation was confirmed by testimony and by the content of the respondent's January 1994 apology letter to Kesavan. Further, the respondent admitted in his response to charges filed by the committee that he told Kesavan the "funds were available" and "in [his] possession." Although the respondent accepts the findings of fact made by the referee, he inexplicably asserts in his brief that his statements to Kesavan were truthful and accurate but merely misinterpreted. It is questionable, therefore, whether the respondent has accepted his wrongdoing. See Wehringer's Case, 130 N.H. 707, 721, 547 A.2d 252, 260 (1988).

■ While the respondent's conduct in each transaction may, by itself, support disbarment, see Budnitz's Case, 139 N.H. at 492, 658 A.2d at 1199 (dishonesty); Woiccak's Case, 131 N.H. at 740, 561 A.2d at 1052 (misuse of funds), when the events are considered together, we are left with no other supportable option. A lawyer's conduct in

violating the clear terms of an escrow agreement and in misleading one client for the benefit of another demonstrably crosses the line of ethical lawyering. While we are mindful of disbarment's severe consequences and do not lightly choose it as a remedy, in this case it is essential to insure public confidence, maintain professional integrity, and deter future conduct. *See Basbanes' Case*, 141 N.H. at 6, 676 A.2d at 96.

■ The respondent argues that his sanction should be limited to a short term of suspension because of mitigating factors. We are not so persuaded. To justify a less stringent sanction, the respondent relies on the absence of a prior disciplinary record, his full cooperation in this disciplinary process, his remedial efforts, good character, remorse, and lack of selfish motive. We examine these claims in turn.

The respondent's assertion that he had no prior disciplinary record is not accurate. The fact that prior complaints against the respondent did not result in *public* disciplinary measures falls substantially short of the respondent's affirmative representation to this court that "[t]he absence of a prior disciplinary record . . . certainly weighs heavily against the Committee's recommendation of disbarment." In fact, the respondent's history reveals that there was a finding of misconduct entered against him in 1974, a caution entered in 1981, and a private reprimand entered in 1993.

■ We are also unpersuaded by the respondent's assertion that his full cooperation in this disciplinary process mitigates against disbarment. While the committee conceded that the respondent cooperated in the investigatory process, cooperation is a mitigating factor only when total and complete. *Basbanes' Case*, 141 N.H. at 7-8, 676 A.2d at 97. The respondent's inaccurate statement that his more than twenty-five years of practice is devoid of disciplinary action may evince an attempt to impede the assessment of an appropriate sanction which could itself constitute additional ethical violations. *See* N.H. R. PROF. CONDUCT 3.3, 8.1, 8.4(a), (c).

■ The respondent's assertion that he made timely good faith efforts to remedy the consequences of his misconduct also rings hollow. The respondent claims that he offered to reimburse Kesavan once he learned that Stewart did not produce the $1,750 deposit. The referee, however, specifically found that "Kesav[a]n arranged for the return of the deposit to [the Turlises] . . . from his own personal account *when the monies were not forthcoming from* either *Nardi* or Stewart." (Emphasis added). *Cf. Whelan's Case*, 136 N.H.

559, 564, 619 A.2d 571, 574 (1992) (noting with favor respondent's actions in paying pecuniary legacies he received from will codicil drafted in violation of Rules 1.8(c) and 1.10(a)).

Moreover, we are not convinced that the respondent's gratuitous preparation of a mortgage on McLaughlin's property to secure Kesavan's $24,500 debt and offer to "pursue whatever avenues come [the respondent's] way to insure" Kesavan's repayment demonstrate his good faith attempt to remedy the consequence of his misrepresentation. The respondent's actions could simply demonstrate his attempt to repair his relationship with Kesavan to avoid a professional misconduct complaint. In fact, the respondent's apology letter to Kesavan was elicited by Kesavan's letter expressing skepticism that the respondent's "professional responsibilities" permitted him to lie in the McLaughlin transaction and noting that Kesavan was considering legal action.

■ The respondent also urges us to consider his lack of dishonest or selfish motive, his good character and reputation, and his remorse as factors mitigating against disbarment. Even assuming these factors are present, disbarment is nonetheless appropriate. *See Basbanes' Case*, 141 N.H. at 8, 676 A.2d at 97. Any good intention the respondent may have had, or the respondent's overly trusting personality as characterized by his counsel, does not preclude disbarment. *See Wehringer's Case*, 130 N.H. at 721, 547 A.2d at 260.

The ethical lapses in this case are fundamental. While the respondent no doubt rendered valuable, ethical, and competent legal services during his career and, therefore, should not be judged on the totality of his career by the events before us, we cannot countenance a lesser sanction without devaluing the basic underpinnings of the legal profession. We order the respondent disbarred and order him to reimburse the committee for its expenses in investigating and prosecuting this case. *See* SUP. CT. R. 37(16). At the end of five years, he may petition this court for readmission to the bar, subject to the requirements under Supreme Court Rules 37(2)(g) and 37(12).

*So ordered.*

BROCK, C.J., and THAYER, J., did not sit; the others concurred.