Original
No. JD-95-001

SNOW'S CASE

February 7, 1996

*Wescott, Millham & Dyer,* of Laconia (*Peter V. Millham* on the brief and orally), for the committee on judicial conduct.

*Sheehan Phinney Bass + Green,* of Manchester (*W. Michael Dunn* on the brief and orally) and *Francis G. Holland,* of Nashua (on the brief), for the respondent.

*Honorable R. Brian Snow,* orally, *pro se.*

BROCK, C.J. After a hearing, the committee on judicial conduct (the committee) unanimously found that a district court judge, R. Brian Snow, had violated Canon 1, Canon 2(A), and Canon 2(B) of our Code of Judicial Conduct. SUP. CT. R. 38. We accept the recommendation of the majority of the committee that Judge Snow (1) be suspended from sitting as a judge for a period of six months, without pay; and (2) be publicly censured. Additionally, a condition of his reinstatement shall be that he complete successfully, at his own expense, a comprehensive course in judicial ethics which has been approved in advance by this court and that he reimburse the committee for its costs associated with this matter.

The committee unanimously found the following facts by clear and convincing evidence. In the early afternoon of Sunday, October 23, 1994, Merrimack Police Department Special Officer Joseph R. Goodridge stopped a speeding car, operated by Judge Snow's brother, Perry Snow. Goodridge issued Perry Snow a summons for speeding.

Later in the afternoon, Goodridge was informed that he had received a telephone call from Judge Snow. Although Goodridge and Perry Snow were acquainted, Goodridge had not recognized that Perry Snow was Judge Snow's brother at the time of the stop. It was after hearing of the telephone call that he realized that Perry Snow was probably Judge Snow's brother. Before he returned the telephone call, Goodridge spoke to another officer in the department about the procedure for "fixing" or voiding a speeding ticket. We repeat the final three paragraphs of the committee's findings verbatim:

> c) Officer Goodridge returned the call to Judge Snow, who stated that he thought it was funny that Officer Goodridge had not recognized Judge Snow's brother because Officer Goodridge had helped Judge Snow's brother paint Judge Snow's house the previous summer. Officer Goodridge stated to Judge Snow that if he had known it was his brother, he would probably have issued a warning. Officer Goodridge told Judge Snow he would feel more comfortable if Judge Snow's brother would come down to the station and bring the summons and that they could then take care of it. At some point during the conversation Judge Snow told Officer Goodridge that he wasn't calling to fix the ticket, he just thought it was funny that Officer Goodridge didn't recognize the Judge's brother.

> d) Thereafter, Judge Snow called his brother and told him to bring the summons to the police station, and that the officer wanted to speak to him. Judge Snow's brother brought the summons to the dispatcher on duty. The summons and all copies thereof were then thrown away, thereby voiding the ticket. No written warning was given to Judge Snow's brother.

> e) On October 25, 1995, in the course of a session of Merrimack District Court over which Judge Snow presided, Judge Snow called Officer Scott Park to the bench and asked him if "Joey" (Officer Goodridge) had told Officer Park what happened that weekend. Officer Park said, "no."

Judge Snow then related to Officer Park that Officer Goodridge had stopped Judge Snow's brother for speeding. Judge Snow stated that he gave Officer Goodridge a call and said, "Hey, what are you doing?" Judge Snow related to Officer Park that Officer Goodridge said he didn't recognize Judge Snow's brother at that time. Judge Snow told Officer Park he had brought it to Officer Goodridge's attention that they had painted Judge Snow's house together, and that Officer Goodridge told Judge Snow that he would take care of the matter.

Based upon these findings, the committee unanimously concluded that Judge Snow had violated Canon 1, Canon 2(A) and Canon 2(B) of the Code of Judicial Conduct. The committee also found, unanimously, that the violations were "of a serious nature so as to warrant formal disciplinary action by the supreme court." *See* SUP. CT. R. 40(10)(d). The full committee recommended to the supreme court that Judge Snow be publicly censured by the court, and that he be required to complete successfully, within one year of our order, a course in judicial ethics, which must be preapproved by this court. In addition, the majority of the committee recommended that Judge Snow be suspended from sitting as a judge for a period of six months, without pay, to begin upon our order.

Because of the great interests placed in our hands and confided to our management, the legal profession, and the judiciary in particular, demand "the strictest integrity." *Wehringer's Case*, 130 N.H. 707, 719, 547 A.2d 252, 259 (1988) (quotation omitted), *cert. denied sub nom. Wehringer v. New Hampshire*, 489 U.S. 1001 (1989). As Justice Benjamin Cardozo once observed, "The great tides and currents which engulf the rest of men do not turn aside in their course and pass the judges by." B. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 168 (1921); *see* Abrahamson, *Foreward* to J. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS at v, v (2d ed. 1995). Accordingly, the canons were created to guide the profession. We adopted the canons by rule in 1973. SUP. CT. R. 38.

The exercise of our constitutional and inherent authority, as well as our superintending control over the courts, N.H. CONST. pt. II, art. 73-a; *In re Mussman*, 112 N.H. 99, 101, 289 A.2d 403, 405 (1972); *see* RSA 490:4 (1983), includes the authority to discipline members of the judiciary. *Opinion of the Justices (Judicial Salary Suspension)*, 140 N.H. 297, 299–300, 666 A.2d 523, 525 (1995). The power to discipline judges is exercised for the protection of the public from further acts of misconduct and to protect the integrity of the judiciary. *Cf. Flint's Case*, 133 N.H. 685, 688, 582 A.2d 291, 293

(1990). We promulgated Supreme Court Rule 39, establishing and describing the committee, and Supreme Court Rule 40, outlining the committee's procedural rules, pursuant to this constitutional, statutory, and inherent authority.

Judge Snow argues to this court: (1) that he is entitled to a *de novo* hearing on the merits before the supreme court; (2) that any violation of the canons was not "serious" and therefore does not require review by the supreme court; and (3) that the facts found by the committee do not support its conclusion that he violated the canons.

## I. De Novo Hearing

We may briefly dispose of Judge Snow's argument that he is entitled to a *de novo* hearing on the merits before this court. He claims that the procedure provided for by Supreme Court Rules 39 and 40 contains two basic flaws: first, the procedure limits the supreme court's ability to review independently the credibility of witnesses; and second, the procedure prevents the complained-against judge from presenting evidence at either level on the issue of sanction. We consider the second part of this argument to be moot. At oral argument, Judge Snow was given the opportunity to address the court, *see* SUP. CT. R. 39(11), and to address particularly the issue of appropriate sanction. Further, although he contends otherwise, there is no evidence that he was *precluded* from presenting evidence on the sanction issue at the committee level. .

Viewed generously, Judge Snow's arguments include due process and equal protection claims under both the State and Federal Constitutions. We discern no equal protection problem because Judge Snow has not asserted how he is being treated differently from other judges facing disciplinary action. *See Petition of Hamel*, 137 N.H. 488, 490, 629 A.2d 802, 803 (1993). His due process claim seems to rest on his assertion that he was denied the opportunity to present evidence of mitigating factors, an argument which we have already rejected, as well as on the broad authority delegated to the committee.

Our rules require the committee to employ the clear and convincing evidence standard. SUP. CT. R. 40(9)(c). Our role on review of the committee's factual findings is not to review the evidence anew, but to determine whether a reasonable person could have found as the committee did based on the evidence before it, that is, to determine if its conclusion is supported by the record. *See Budnitz' Case*, 139 N.H. 489, 491, 658 A.2d 1197, 1198 (1995); *Wehringer's Case*, 130 N.H. at 716, 547 A.2d at 257. We treat the question of what sanction is appropriate *de novo*, however, "directing such disciplin-

ary action as [we] find[] just and proper." SUP. CT. R. 39(11); *see Opinion of the Justices (Judicial Salary Suspension)*, 140 N.H. at 300, 666 A.2d at 526.

■ Supreme Court Rules 39 and 40 provide extensive procedural rights to judges who must come before the committee, including the power to subpoena witnesses, the right to counsel, and the rights to cross-examine witnesses and to present witnesses on the judge's own behalf. SUP. CT. R. 40(7)(d)(2), 40(8). The hearing before the full committee is transcribed verbatim for our review. SUP. CT. R. 40(10)(d); *see* SUP. CT. R. 40(9)(f) (copy of transcript to be provided to complained-against judge free of charge). Judges are informed in advance what issues will be considered at the committee hearing, SUP. CT. R. 40(7), and are informed in advance that they may present evidence of mitigating circumstances. *See* SUP. CT. R. 40(7)(f). There is but one evidentiary hearing under our rules: we review the record in its entirety, including the verbatim reproduction of the hearing, to determine whether the committee's factual findings are supported by the evidence, whether we agree that the facts support a finding of a canon violation, and whether that violation is serious. We then determine, independently, what sanction should be imposed. We conclude that the procedural and due process protections in this scheme exceed what is required by either the New Hampshire or Federal Constitution. *See Royer v. State Dep't of Empl. Security*, 118 N.H. 673, 677-78, 394 A.2d 828, 830-31 (1978).

## II. "Serious" Misconduct

■ On the merits, Judge Snow first contends that the facts found by the committee, even if taken in their entirety as true, do not constitute a violation of the canons that is "of a serious nature" so as to warrant formal disciplinary action by the supreme court. *See* SUP. CT. R. 40(10)(c). The committee unanimously found that the violations were sufficiently serious to warrant our attention. Judge Snow offers the language of Rule 40(10)(c), which provides that if the committee concludes that a judge has violated the code, "but that the violation is not of a sufficiently serious nature to warrant the imposition of formal discipline by the supreme court, it shall dispose of the matter by informal resolution or adjustment." Rule 40(10)(c) further provides that "[t]hese informal adjustments shall be the *usual and customary procedures*" (emphasis added) used by the committee to dispose of cases where the committee finds a violation of the Code of Judicial Conduct. *But see Judicial Conduct Committee Hearings Now Open to Public*, NEW HAMPSHIRE BAR

NEWS, Jan. 17, 1996, at 1, 22 (quoting in full our order of January 2, 1996, which amended Rule 40 to delete the "usual and customary procedures" language).

Judge Snow first directs our attention to several judicial conduct cases from other jurisdictions where the conduct involved was "serious." He cites, for example, *Matter of Wait*, 490 N.E.2d 502 (N.Y. 1986), in which the judge engaged in "affirmative behavior" that supported the court's finding a "serious" violation. In *Matter of Wait* the implicated judge presided over six cases involving close relatives, on several occasions reducing traffic charges on his own motion. *Id.* at 502-03. The New York Court of Appeals concluded that this was "serious misconduct" which created the appearance of impropriety in violation of Canon 2. *Id.* at 503; *see Matter of Reedy*, 475 N.E.2d 1262, 1263 (N.Y. 1985). Apparently, because the facts underlying the instant case are clearly *less* "serious," we are to conclude that they are *not* "serious." We decline to do so. We conclude that Judge Snow's misconduct, constituting violations of several canons, was "serious."

■ Judge Snow's second basis for claiming that his case should be resolved informally because he did not engage in "serious" misconduct is that he did not intend to "fix" his brother's ticket. There is no intent requirement in these canons. *Cf. Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859 (1988) (scienter is not an element of a violation of federal rule governing recusal where impartiality might reasonably be questioned). In fact, it is practically impossible to impose a *mens rea* element on the "appearance of impropriety" standard in Canon 2. *See Blaisdell v. City of Rochester*, 135 N.H. 589, 593, 609 A.2d 388, 390 (1992). "Whether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge himself, question the impartiality of the court." *Id.*; *see United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986). Accordingly, "[t]he subjective intent or motivation of the judge is not a significant factor in assessing [the judge's] conduct . . . under this standard." *Adams v. Com'n on Judicial Performance*, 897 P.2d 544, 548 (Cal. 1995) (analyzing standard of "bringing the judicial office into disrepute"); *see Wehringer's Case*, 130 N.H. at 721, 547 A.2d at 260. We reject Judge Snow's argument that we dismiss the recommendation of the committee and order an informal resolution.

*III. Canon Violations*

■ We disagree with Judge Snow's contention that the committee's finding that he violated three canons is not supported by its

own findings of fact. Judge Snow contends that the evidence does not support the committee's conclusion that he violated Canon 1 because the committee failed to consider his "motivation" for making the telephone call to Goodridge. First, it is clear to us that the committee considered, and either rejected or determined to be irrelevant, Judge Snow's argument that he telephoned Goodridge because of a concern that the summons had been issued to his brother due to some sort of retaliatory motive directed toward Judge Snow himself.

Canon 1 provides:

> *A Judge Should Uphold the Integrity and Independence of the Judiciary*
> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.

SUP. CT. R. 38, Canon 1 (*Code of Judicial Conduct*). Judge Snow claims that the telephone call's "effect on the integrity of the judiciary cannot be determined apart from . . . its intent." As we have previously stated, however, Judge Snow's "motivation" does not affect our decision regarding these canons. *See Blaisdell*, 135 N.H. at 593, 609 A.2d at 390. Further, Judge Snow does not dispute the committee's finding that

> Judge Snow was aware that the result of his telephone call was that his brother's ticket would be "taken care of." With knowledge that his intervention, *whether or not innocently undertaken*, would result in preferential treatment of his brother, Judge Snow did nothing to deter such favoritism.

(Emphasis added.) His subsequent realization that the telephone call was a "grave mistake," and his subsequent decision to "voluntarily appear[] before the Committee and fully explain[] his position and answer[] questions from the Committee" do nothing to mitigate the effect his actions had on the "integrity and independence of the judiciary," as protected in Canon 1. SUP. CT. R. 38, Canon 1 (*Code of Judicial Conduct*). As the committee found, "[e]ven the appearance that Judge Snow intervened to obtain favorable treatment from the police for his brother plainly undermines public confidence in the integrity and impartiality of the judiciary." We conclude that the committee's finding that Judge Snow violated Canon 1 is supported by clear and convincing evidence.

■ Judge Snow again asserts his innocent "motive" with regard to both subparts of Canon 2, relating to the appearance of impropriety. In addition, he claims that his telephone call, in and of itself, does not create an appearance of impropriety in violation of the canon. Canon 2 provides:

*A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities*

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him.

SUP. CT. R. 38, Canons 2A, B (*Code of Judicial Conduct*). The committee found:

Even assuming that Judge Snow was not subjectively aware of the impropriety of his telephone call at the time that he made it, Judge Snow should have known that his actions would create the appearance of impropriety. It cannot be disputed that Judge Snow's actions did create the appearance of impropriety, and he has admitted as much in both his answer and his testimony.

Indeed, in his brief Judge Snow states that "[w]ith the benefit of hindsight, [he] now understands that this action, while efficient and effective in satisfying his suspicions, allowed for misinterpretation and unforeseen consequences." Whatever his motive, it is no cure for conduct that creates an appearance of impropriety. *Cf. Wehringer's Case*, 130 N.H. at 721, 547 A.2d at 260 (concluding in an attorney misconduct case that "[g]ood intention will not substitute for the requirement of competence").

■ Judge Snow again directs our attention to cases where the judicial ethics violation was more serious than his, *see, e.g., Matter of Ross*, 428 A.2d 858 (Me. 1981), and advises us that his "action pales by comparison." We refuse to hold that, simply because the violations described in cases such as *Matter of Ross* were more egregious than that in the instant case, we should conclude that no violation has occurred.

■ We agree with the committee that Judge Snow's actions constituted violations of both subparts of Canon 2. He failed to conduct himself "at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary," and he lent "the prestige of his office to advance the private interests of others." SUP. CT. R. 38, Canons 2A, B (*Code of Judicial Conduct*).

*IV. Sanction*

As we have stated, Judge Snow argues not only that his conduct did not constitute violations of our canons, but also that, even if the conduct did constitute violations, we should conclude that the violations are not "serious" enough to warrant the sanctions recommended by the committee. We decline to do so.

A judge's duty to obey the canons, especially to avoid the appearance of impropriety, cannot be taken lightly. *See Wehringer's Case*, 130 N.H. at 719, 547 A.2d at 259. Judges are entrusted with immense authority over matters that affect the lives of all of New Hampshire's citizens. On any given day, a judge may decide the merits of a dispute between neighbors, the fault of two parties to an automobile accident, or the liberty of a person charged with the commission of a crime. It is a great public trust. Indeed, judges are the most visible symbol of the rule of law in our society. Without judges who are perceived and trusted by members of the public as impartial, the authority of the rule of law is compromised.

> It is axiomatic that an independent and vigorous judiciary is essential as a bulwark to protect the rights of our citizens. An infringement on the independence of the judiciary is an immediate threat to the fundamental concept of government under law.

*Matter of Ross*, 428 A.2d at 861 (footnote omitted). Such an infringement is dangerous whether it is actual, or only perceived by the public.

For this reason the New Hampshire Constitution declares, "It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST, pt. I, art. 35. Even though, for example, a particular judge may believe that a particular action will not affect that judge's ability to decide legal matters impartially, it is the public's perception of the ability that is important. In this area, "[p]erceptions may become reality." *Inquiry Relating to Alvord*, 847 P.2d 1310, 1314 (Kan. 1993). This case is a perfect example of the justification for ethical review boards such as the committee, and reminds us of Thomas Jefferson's observation that "man can not be trusted with the government of himself." Jefferson,

*First Inaugural Address, in* 5 THE FOUNDERS' CONSTITUTION 151, 152 (Kurland & Lerner eds., 1987).

Judge Snow professes to have had innocent motives at the time he made the telephone call, and not to have understood the likely consequences of the telephone call until after it was too late. Based on the committee's findings of impropriety in this case, with which we concur, we find these professions of little significance.

Judge Snow made a telephone call to a police officer, whom he knew personally, a short time after his brother had received a citation for speeding. This police officer, Goodridge, has appeared as a witness in Judge Snow's court, and is likely to appear before him in the future. Goodridge, along with Perry Snow, had painted Judge Snow's house during the previous year, for no consideration. Judge Snow now refers to his decision to make the telephone call as "impulsive" and "ill-advised," but suggests that we should recognize it as a "single, isolated error in judgment," and conclude that it was not a sufficiently serious violation to warrant the severe sanctions suggested by the committee. We decline to do so. Judge Snow's remorse in this matter seems to stem primarily from the result of his action, that is, the instant judicial conduct proceeding, not from any recent realization of its seriousness.

Accordingly, it is ordered that:

1. Judge Snow is publicly censured for misconduct.

2. Effective today, Judge Snow is suspended from sitting as a judge for a period of six months, without pay, and pending further order of this court.

3. As a condition of his reinstatement, Judge Snow must complete successfully a comprehensive course in judicial ethics, to be approved in advance by this court. This judicial ethics course shall be completed at Judge Snow's own expense.

4. As a condition of his reinstatement, Judge Snow must reimburse the committee for its costs associated with this matter.

*So ordered.*

JOHNSON, J., did not sit; the others concurred.