Original
JD-2000-001

## PETITION OF W. STEPHEN THAYER, III

August 15, 2000

*Kenna, Johnston & Sharkey, P.A.*, of Manchester (*Kevin E. Sharkey* on the brief and orally), for W. Stephen Thayer, III.

*Nelson, Kinder, Mosseau & Saturley, P.C.*, of Manchester (*William C. Saturley* and *Christine M. Renda* on the brief, and *Mr. Saturley* orally), for the committee on judicial conduct.

PER CURIAM. The petitioner, W. Stephen Thayer, III, seeks a writ of prohibition that would bar the New Hampshire Supreme Court Committee on Judicial Conduct (JCC) from continuing to consider allegations of judicial misconduct said to have been committed by him during his tenure as an associate justice of the New Hampshire Supreme Court. We decline to issue the writ.

The JCC opened an investigation into Mr. Thayer's conduct as a member of the supreme court in response to a June 1999 letter from Mr. Thayer. On March 31, 2000, while the JCC investigation was still underway, then Justice Thayer submitted his resignation. This petition followed.

██ The standards governing the issuance of a writ of prohibition are well established.

> Prohibition is proper "to prevent a tribunal possessing judicial or quasi-judicial powers from exercising jurisdiction over matters not within its cognizance or exceeding its jurisdiction in matters of which it has cognizance." 63C AM. JUR. 2D *Prohibition* § 1, at 6 (1997). "Prohibition is an extraordinary remedy which, although within the discretion of this court, is used with caution and forbearance and only when the right to relief is clear." *State v. Superior Ct.*, 116 N.H. 1, 2, 350 A.2d 626, 627 (1976); *see Manchester Education Ass'n v. Superior Court*, 109 N.H. 513, 514, 257 A.2d 23, 24 (1969).

*Petition of Mone*, 143 N.H. 128, 132, 719 A.2d 626, 630 (1998).

Mr. Thayer argues that upon his resignation, the JCC lost its jurisdiction to investigate his conduct as a judge. He bases his argument on Supreme Court Rules 39 and 40, case law from other jurisdictions, and the mootness doctrine.

The JCC objects, contending that Justice Thayer's resignation did not divest the JCC of its jurisdiction to continue its investigation of conduct said to have occurred while the petitioner was still a member of the supreme court. The JCC bases its position on the purposes for which the rules of judicial conduct were created, a different reading of the supreme court rules, case law from other jurisdictions, and an assertion that its investigation is not moot. We agree with the JCC position.

The JCC is a committee of the supreme court, established pursuant to constitutional and statutory authority. SUP. CT. R. 39(1); *see* N.H. CONST. pt. II, art. 73-a; RSA 490:4 (1997); *see also In re Mussman,* 112 N.H. 99, 101, 289 A.2d 403, 405 (1972) (explaining that RSA 490:4 "has generally been recognized as confirming the common-law powers of this court [to exercise general superintendence of the State's courts] from its beginning") (citation omitted). Contrary to the position maintained by the petitioner, the JCC is not strictly an administrative agency, and the rules pertaining to grants of authority to administrative agencies in general are less apposite to the issues raised in this case.

In *Opinion of the Justices (Judicial Salary Suspension),* 140 N.H. 297, 300, 666 A.2d 523, 525 (1995), the court observed:

> The superintending control of the supreme court is comprehensive. *State ex rel. Brown v. Knowlton,* 102 N.H. 221, 223, 152 A.2d 624, 625 (1959). Accordingly, this court has the responsibility to protect and preserve the judicial system. We have the inherent authority to take whatever action is necessary to effectuate this responsibility.

*See also* SUP. CT. R. 38, Canon 1:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective *without any limitation upon the supreme court in the exercise of its powers of general superintendence, whether constitutional, statutory or inherent, in areas not delineated in the Code.*

(Emphasis added). As the petitioner has acknowledged, even if we were to conclude that Supreme Court Rules 39 and 40 do not authorize the JCC to continue an investigation of a judge who has resigned, the supreme court would retain the constitutional, statutory, and inherent power to authorize such an investigation.

The New Hampshire Constitution "provides in emphatic terms that '[i]t is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit,' and therefore judges 'should hold their offices so long as they behave well.'" *In re Mussman,* 112 N.H. at 102, 289 A.2d at 405 (quoting N.H. CONST. pt. I, art. 35). Before it adopted the Code of Judicial Conduct in

1973, *see Snow's Case*, 140 N.H. 618, 621, 674 A.2d 573, 575 (1996), or established the JCC in 1979, the supreme court explained that "[i]f the judiciary had no means by which this constitutional provision could be implemented in practice as well as theory, *the average citizen would wonder whether he was receiving the type of impartial justice that the constitution requires*," *In re Mussman*, 112 N.H. at 102-03, 289 A.2d at 405 (emphasis added). Thus, fostering public confidence in the judiciary, as well as maintaining its integrity, have long been fundamental purposes of New Hampshire's system of judicial discipline. *See also In re Mussman*, 113 N.H. 54, 57, 302 A.2d 822, 824 (1973) ("maintenance of confidence in the courts is no less important" than "maintenance of public confidence in the bar as a whole").

The supreme court has recently stated that "[t]he power to discipline judges is exercised for the protection of the public from further acts of misconduct and to protect the integrity of the judiciary." *Snow's Case*, 140 N.H. at 621, 674 A.2d at 575 (citing *Flint's Case*, 133 N.H. 685, 688, 582 A.2d 291, 293 (1990)). A similar concern with protecting the public is reflected in the case law of many of our sister states, *see, e.g., Matter of Johnstone*, No. S-8387, slip op. at 15 (Alaska 2000) ("we have held that a primary purpose of judicial discipline in Alaska is to protect the public rather than to punish the judge"). The American Bar Association has also espoused a similar position. *See* ABA STANDARDS RELATING TO JUDICIAL DISCIPLINE AND DISABILITY RETIREMENT (Tentative Draft, 1977) ("the major purpose of judicial discipline is not to punish judges, but to protect the public, preserve the integrity of the judicial process, maintain public confidence in the judiciary, and create a greater awareness of proper judicial behavior on the part of judges themselves").

■ The integrity of the judicial system is fostered not just by the removal or suspension of a judge who has violated the Code of Judicial Conduct, but also by the investigative process of the JCC, the JCC's ability "to hold a public hearing on a statement of formal charges," SUP. CT. R. 39(9)(g), and the availability of sanctions other than removal from office, such as public censure, *see Snow's Case*, 140 N.H. at 628, 674 A.2d at 579-80 (imposing sanctions which included: (1) public censure; and (2) a six-month suspension with reinstatement conditioned upon *inter alia* completion of a course on judicial ethics).

The JCC's power to investigate and hold hearings, and the supreme court's power to censure, protect the public because

"[w]ithout judges who are perceived and trusted by members of the public as impartial, the authority of the rule of law is compromised." *Snow's Case*, 140 N.H. at 627, 674 A.2d at 579. Public trust is in large part derived from the public's perception of the judiciary, *see id.* (citing *Inquiry Relating to Alvord*, 847 P.2d 1310, 1314 (Kan. 1993)). A viable and continuing JCC investigative process is an integral source of confidence upon which public perception may be based. When members of the public are informed as to judicial misconduct, they are better able to recognize, report, and otherwise protect themselves against future instances of similar misconduct. *See Matter of Johnstone*, slip op. at 16 ("another way to protect the public [in addition to removing offending judges from office] is to keep it informed of judicial transgressions and their consequences, so that it knows that its government actively investigates allegations of judicial misconduct and takes appropriate action when these allegations are proved") (citing *Matter of Probert*, 308 N.W.2d 773, 776 (Mich. 1981); *In re Kneifl*, 351 N.W.2d 693, 700 (Neb. 1984); *In re Eastburn*, 914 P.2d 1028, 1035 (N.M. 1996)).

In short, we agree with the New York Court of Appeals that judicial "discipline is warranted to maintain the public's confidence in the integrity of the judiciary as an institution," *Matter of Backal*, 660 N.E.2d 1104, 1107 (N.Y. 1995), and that the "goal [of maintaining public confidence in the integrity of the judiciary] is served by permitting the Commission [on Judicial Conduct] to follow through with removal proceedings whenever a Judge engages in serious misconduct while in office and despite a Judge's resignation or pledge not to seek a future judicial post." *Id.*

In light of our agreement with the principle that the discipline of judges, no less than the discipline of attorneys, is intended to be a way of "protect[ing] the public, maintain[ing] public confidence . . ., preserv[ing] the integrity of the legal profession, and prevent[ing] similar conduct in the future," *Morgan's Case*, 143 N.H. 475, 477, 727 A.2d 985, 987 (1999) (quoting *Budnitz' Case*, 139 N.H. 489, 492, 658 A.2d 1197, 1199 (1995)), rather than "a mode of inflicting punishment for an offense," *Morgan's Case*, 143 N.H. at 477, 727 A.2d at 987 (citing *Silverstein's Case*, 108 N.H. 400, 401, 236 A.2d 488, 490 (1967)), we cannot find the JCC's investigation to be moot. We are further directed toward this position by Supreme Court Rule 40, which does not limit the supreme court to the sanction of suspension and which assigns to the court the duties of holding a public hearing and issuing a written opinion when warranted. SUP. CT. R. 40(13). For these reasons, the fact that the petitioner's

resignation took certain sanctions off the table does not render moot the JCC's investigation.

> "The question of mootness is one of convenience and discretion and is not subject to hard-and-fast rules," however. *Appeal of Hinsdale Fed. of Teachers*, 133 N.H. 272, 276, 575 A.2d 1316, 1318 (1990) (quotation omitted). We generally will refuse to review a question that "no longer presents a justiciable controversy because issues involved have become academic or dead," *id.* at 276, 575 A.2d at 1318-19 (quotation omitted), but may review a question that has become moot if it involves a significant constitutional question or an issue of significant public concern, *Royer v. State Dep't of Empl. Security*, 118 N.H. 673, 675, 394 A.2d 828, 829 (1978).

*Petition of Brooks*, 140 N.H. 813, 816, 678 A.2d 140, 141-42 (1996). Here, the issues before the JCC are not academic or dead because of the availability of the sanction of public censure. As the Supreme Court of Michigan held in similar circumstances, "[b]ecause the possibilities of censure and conditional suspension remain after a judge charged with misconduct steps down or fails to be re-elected, a judicial discipline case does not become moot the instant the judge leaves office. Effective relief can still be granted; a controversy still exists." *Matter of Probert*, 308 N.W.2d at 777 (citations omitted); *see also In re Peoples*, 250 S.E.2d 890, 913 (N.C. 1978) ("where the statute imposes sanctions in addition to ouster, the proceeding may be prosecuted to its conclusion despite the official's resignation").

The petitioner's decision to resign his office terminated any potential impeachment inquiry against him. As a result, the investigation and possible public hearings authorized by Supreme Court Rules 39 and 40 take on greater importance in providing a public resolution of the allegations of misconduct by Mr. Thayer. Even if the JCC had no sanctions available and this matter were technically academic, there can be little doubt that the issues under investigation by the JCC qualify as "issue[s] of significant public concern," *Petition of Brooks*, 140 N.H. at 816, 679 A.2d at 142. Thus, the petitioner's reliance on the mootness doctrine is misplaced. *See Matter of Cox*, 658 A.2d 1056, 1057-58 (Me. 1996) (holding that imposition of sanctions upon retired judge was not moot because the court designs "sanctions to restore and reaffirm public confidence in the administration of justice, and to announce publicly our recognition and condemnation of judicial misconduct") (citation omitted).

■ To construe Supreme Court Rules 39 and 40 as divesting the JCC of its jurisdiction over judicial misconduct upon the resignation of a judge under investigation would run counter to the manifest purposes of New Hampshire's system of judicial discipline. Accordingly, we hold that the JCC's jurisdiction was not terminated upon the petitioner's resignation. For that reason, and in light of the caution and forbearance with which we must use the extraordinary remedy of prohibition, *Petition of Mone*, 143 N.H. at 132, 719 A.2d at 630, we decline, on the facts of this case, to issue a writ of prohibition. Nonetheless, due to the importance of the matter before us, we address certain of the other arguments advanced by the petitioner.

Supreme Court Rule 37 provides that "[s]uspension or disbarment of an attorney shall not terminate jurisdiction of this court," SUP. CT. R. 37(1), and further provides that an attorney under disciplinary investigation may resign from the bar only if he or she admits to the facts upon which the complaint against him or her is based, concedes that he or she has no defense, and receives the permission of the supreme court, SUP. CT. R. 37(9). The rules pertaining to judicial conduct contain no similar provision. In the petitioner's view, the lack of parallel provisions in the rules pertaining to judicial conduct manifests the supreme court's intent to terminate the jurisdiction of the JCC upon the resignation of a judge under investigation. He argues that we can rule that the JCC has continuing jurisdiction only by reading into Rules 39 and 40 a provision that the supreme court did not choose to include when those rules were originally drafted. We disagree.

■ The rules of judicial conduct and the rules of professional conduct are not *in pari materia*. The rules of judicial conduct pertain to judges and others who are officers of the State charged with the administration of an impartial system of justice. Judges are appointed by the governor, N.H. CONST. pt. II, art. 46, to positions they may hold until their retirement, subject only to removal in extraordinary circumstances, N.H. CONST. pt. II, arts. 38, 39, 73. A judge who is under investigation by the JCC and who wishes to resign his or her appointment does so by notifying the governor of his or her intention to resign. The rules of professional conduct pertain to attorneys who are licensed to practice by the supreme court under Supreme Court Rule 42, and whose licenses must be renewed annually. An attorney who is under investigation by the New Hampshire Supreme Court Committee on Professional Conduct (PCC) and who wishes to resign from the bar may do so only

with the leave of the supreme court, and only after admitting and conceding the disciplinary case that had .been brought against him or her. SUP. CT. R. 37(9). Because of these differences between the rules of professional conduct and the rules of judicial conduct, there is little basis for using the former as an aid· in interpreting the latter.

The JCC was established under the supreme court's comprehensive constitutional, statutory, and inherent authority to superintend the court system of this State. *See* SUP. CT. R. 39(1). Given both the scope of the court's authority and the purposes to be served by the system of judicial discipline administered by the JCC, it is not necessary for the rules to include a specific statement giving the JCC jurisdiction over judges who have resigned their appointments. *See* SUP. CT. R. 38, Canon 1.

The rules pertaining to the professional conduct of attorneys stand on a somewhat different footing. The supreme court's authority to discipline attorneys, as exercised by the PCC, is based upon the court's authority over admission to and dismissal from the bar. Thus, Supreme Court Rule 37 contains the following statement of jurisdiction:

> Any attorney admitted to practice law in this State or any attorney specially admitted to practice by a court of this State is subject to the disciplinary jurisdiction of this court and the committee on professional conduct as hereinafter defined. Nothing herein contained shall be construed to deny to any other court such powers as are necessary for that court to maintain control over proceedings conducted before it, such as the power of contempt. Suspension or disbarment of an attorney shall not terminate jurisdiction of this court.

SUP. CT. R. 37(1)(a). In light of the first sentence of this statement of jurisdiction, both the last sentence of Rule 37(1)(a) and Rule 37(9) are necessary in order to close a "loophole" that could otherwise allow attorneys who have been suspended or disbarred, or who have resigned from the bar, to escape the jurisdiction of the PCC. Because Rules 39 and 40 do not contain a jurisdictional statement such as the first sentence of Rule 37(1)(a), there is no "loophole" to close, and no need for any provisions parallel to the last sentence of Rule 37(1)(a) and Rule 37(9).

While phrased differently, the rules of the PCC and the JCC have a similar scope, and provide each of the supreme court's disciplinary committees with jurisdiction over those who come before them until

the final resolution of a matter that has been properly initiated. In the case of an attorney subject to discipline administered by the PCC, the supreme court will not accept his or her resignation, and therefore relinquish jurisdiction, until the attorney admits the facts upon which the complaint is predicated and concedes that he or she has no defense. SUP. CT. R. 37(9). This required admission and concession closes the case by fully resolving all factual and legal issues. With respect to a judge, over whose resignation the supreme court has no control, the court's comprehensive constitutional, statutory, and inherent authority to superintend the court system vests the JCC with jurisdiction over a judge who has resigned until the JCC concludes any properly initiated investigation and until the supreme court has responded to any recommendation made by the JCC. This is how the court can ensure that allegations of judicial misconduct may be resolved and concluded, factually and legally. In either situation, the appropriate disciplinary body retains its jurisdiction until the matters before it have been brought to a point of factual and legal — not just procedural — resolution.

Such a concern with final resolution has been recognized in a number of other states. *See, e.g., Matter of Cox*, 658 A.2d at 1058 ("Our authority to discipline Cox was acquired when he qualified for his judicial position and continues after his retirement for any conduct that occurred while he was a judge."); *In re Hunt*, 302 S.E.2d 235, 239 (N.C. 1983) (". . . there is but one disciplinary proceeding. It began when the Commission filed its complaint, and it will end with this Court's final order.") (citations omitted); *Judicial Inquiry & Review Bd. v. Snyder*, 523 A.2d 294, 299 (Pa. 1987) ("Once instituted, our jurisdiction over disciplinary proceedings is thus only at an end when we issue a final order.") (citations omitted); *Kennick v. Commission on Judicial Perf.*, 787 P.2d 591, 596 (Cal. 1990) (explaining that findings of judicial conduct proceedings continued after resignation of judge under investigation serve same purpose as requirement that attorney seeking to resign from the bar while under professional conduct investigation must admit the facts on which he or she has been charged and concede the case against him or her).

█ Our discussion of the distinction between the JCC and the PCC causes us to reject, as well, the petitioner's contention that upon the resignation of a judge under investigation by the JCC, the JCC should "hand off" its investigation to the PCC. While all judges may now be attorneys, it does not necessarily follow that judicial conduct is a subset of professional conduct. Attorneys and judges

operate under two different codes of conduct, each enforced by a committee with particular expertise in its own area of responsibility. *See Matter of Yaccarino*, 502 A.2d 3, 31 (N.J. 1985) (holding that judge's "application for a retirement based on medical disability cannot supplant . . . judicial removal proceedings" and noting "the different and special concern that is implicated in judicial disciplinary actions that is not suitably addressed by other judicial or administrative proceedings arising from a judge's performance in office") (citation omitted). Accordingly, we find no merit in the petitioner's suggestion that his case should be passed along to the PCC.

We conclude with a review of case law from other states. Both parties acknowledge a split of opinion among other jurisdictions on the question of whether the resignation of a judge terminates the jurisdiction of a body such as the JCC. While recognizing that each of the decisions discussed below may rest on a statutory and regulatory foundation that may be dissimilar in some ways to the legal basis for judicial discipline in New Hampshire, we nonetheless agree with the JCC that the weight of authority favors the continuation of its jurisdiction. *See Matter of Johnstone*, slip op. at 13 ("A majority of states agree with the ABA that a disciplinary body retains jurisdiction over a judge who has voluntarily retired after alleged acts of misconduct.") (citations omitted); *see also* ABA MODEL RULES FOR JUDICIAL DISCIPLINARY ENFORCEMENT, Rule 2(b)(2) (1994).

The petitioner points to New Jersey, Vermont, and Illinois as states in which a judicial conduct committee loses its jurisdiction over a judge who resigns his or her judicial office. His reliance on case law from these states is misplaced.

In three cases, *Matter of Sgro*, 310 A.2d 459 (N.J. 1973), *Matter of Vasser*, 382 A.2d 1114 (N.J. 1978), and *Matter of DeLucia*, 387 A.2d 362 (1978), the New Jersey Supreme Court issued holdings to the effect that a judge, "[h]aving resigned . . . is no longer subject to being disciplined as a judge, and is before us only in his capacity as a member of the bar," *id.* at 366 (citation omitted). All three of these cases, however, involved part-time municipal court judges who were subject simultaneously to both rules of professional conduct and rules of judicial conduct. Furthermore, in a more recent case, involving a superior court judge subject to a statutory removal proceeding, the New Jersey Supreme Court held that the judge's "application for a retirement based on medical disability cannot supplant these judicial removal proceedings." *Matter of Yaccarino*, 502 A.2d at 31.

In Vermont, the Supreme Court had earlier held that "[h]aving retired, Judge Fienberg is no longer subject to being disciplined as a judge." *In re Fienberg*, 430 A.2d 1282, 1283 (Vt. 1981) (citing *Matter of DeLucia*, 387 A.2d at 366). Later, however, in a case involving a judge who was not reelected to her position during the pendency of a proceeding before the Judicial Conduct Board (JCB), the Vermont Supreme Court ruled:

> The defendant claimed that when her term of office terminated and she was not reelected, all jurisdiction over her with respect to judicial discipline terminated. It is the view of this Court that jurisdiction for purposes of judicial discipline attaches when a complaint is filed during judicial tenure relating to acts done as a judicial officer, and persists until ousted by some affirmative legal requirement. . . . Even though the circumstance that judicial office is no longer occupied may make certain dispositions inappropriate, this does not impair jurisdiction . . . .

*In re Wheel*, 533 A.2d 1194, 1195 (Vt. 1987). Even more recently, in a case in which a judicial conduct complaint was filed *after* a judge left the bench, *In re Steady*, 641 A.2d 117 (Vt. 1994), the Vermont Supreme Court, noting its broad constitutional power to discipline judges, *id.* at 118 (citations omitted), stated that "[n]othing in the Constitution, the statute, or the rule limits the disciplinary power over judicial officers to those who are currently serving," *id.* According to that court:

> A primary purpose of judicial discipline is to "preserve and enhance public confidence in the integrity and fairness of the justice system." [*In re*] *O'Dey*, 159 Vt. [590,] 602, 622 A.2d [507,] 515 [(1993)]. These goals cannot be accomplished using either of the methods proposed by the dissent – disciplining ex-judges as attorneys through the Professional Conduct Board or disciplining ex-judges through the JCB only if they return to office. Applying this rule, any nonattorney judge can escape discipline for a code violation, no matter how serious, by resigning. Even after leaving office, an ex-judge retains the status of the judicial office on his resume. The public is entitled to know if the record is tarnished.

> We agree with Justice Billings' observation that the judicial conduct rules did not intend nonattorney judges to avoid discipline by resigning and "that to interpret the rules in

accordance with [that view] would emasculate them and thwart the Court's duty to preserve and protect the integrity of the judiciary." *In re Fienberg*, 139 Vt. 511, 513, 430 A.2d 1282, 1283 (1981) (Billings, J., dissenting); *see also West Virginia Judicial Hearing Board v. Romanello*, 175 W.Va. 577, 336 S.E.2d 540, 541 (1985) (court "would be ill-advised to establish a precedent that would allow a judge . . . to escape punishment for [ethics violations] by resigning from office"); *In re Sheppard*, 815 S.W.2d 917, 920 (Tex.Spec.Ct.Rev. 1991) (judicial conduct board retains jurisdiction over retired or former judges who have not renounced their intent to serve on bench in future).

*In re Steady*, 641 A.2d at 118. While Judge Steady was a nonattorney judge, which distinguishes him from the petitioner in this case, the underlying principles articulated in *Steady* support our opinion that the JCC retains its jurisdiction over the petitioner.

The Illinois case cited by the petitioner, *In re Dempsey*, 2 Ill. Cts. Comm. 100 (1987), is distinguishable from this case due to a significant structural difference between the administration of judicial discipline in Illinois and New Hampshire. The New Hampshire JCC is a committee of the supreme court and is vested with some but not all of the comprehensive constitutional, statutory, and inherent authority of the court to superintend the judicial system of the State. By contrast, "the [Illinois] Courts Commission has exclusive authority to discipline judges pursuant to rules promulgated by the Illinois Supreme Court, rules which apply only to judges actually serving in a judicial capacity," *id.* at 108. In *Dempsey*, the Courts Commission specifically decided that the fact of its exclusive authority to discipline judges — which gave the Commission a greater degree of independence from the Illinois Supreme Court than a mere court committee would have — rendered less apposite the case law from jurisdictions such as New Hampshire in which the body in charge of judicial conduct acts as a committee of a supreme court which holds the ultimate disciplinary authority. Accordingly, the Courts Commission's decision in *Dempsey* has insufficient bearing on the case before us.

In New York, "Judiciary Law § 47 grants the Commission on Judicial Conduct and [the] Court [of Appeals of New York] jurisdiction to remove a resigned Judge for 120 days from the date of her resignation." *Matter of Backal*, 660 N.E.2d at 1106. According to the petitioner, the existence of this statutory authority for a post-resignation removal makes the New York case materially distin-

guishable from the circumstances of this case, because Supreme Court Rules 39 and 40 contain no provision similar to New York's 120-day "extension" of jurisdiction. We disagree.

The important part of *Backal* is not that the Commission on Judicial Conduct is empowered by statute to continue proceedings against a judge who has resigned; rather, it is that the Court of Appeals upheld Judiciary Law § 47 against a constitutional challenge. When it analyzed Judiciary Law § 47 in relation to a grant of constitutional authority similar to that contained in the New Hampshire Constitution, the Court of Appeals concluded that

> this constitutional grant of authority to the Commission to discipline and remove "judges" necessarily and logically covers all acts of misconduct undertaken by a Judge while serving in office. The fact that a particular Judge may no longer hold that office at the time removal is sought or recommended by the Commission, due to the Judge's postmisconduct resignation, does not preclude the Commission or this Court from exercising their respective disciplinary powers.

*Matter of Backal*, 660 N.E.2d at 1106-07. While the *Backal* court acknowledged that the removal of judges who have resigned is necessary to insure that judges cannot resign in order to avoid removal, only to "seek future [judicial] office to the public's detriment," *id.* at 1107, the court also cited "the greater institutional goals sought to be achieved by the constitutional provisions governing judicial discipline," *id.*, and identified one of those goals as "maintain[ing] the public's confidence in the integrity of the judiciary as an institution," *id.* "That goal is served by permitting the Commission to follow through with removal proceedings whenever a Judge engages in serious misconduct while in office and despite a Judge's resignation or pledge not to seek a future judicial post." *Id.* Even if we assume that the petitioner's opportunity for achieving further judicial office is remote, the possibility is not foreclosed. New Hampshire shares with New York a strong interest in maintaining the public confidence in the integrity of the judiciary. Therefore, our decision in this case is consistent with the principles established by the courts in a majority of the states which have considered questions similar to those before us.

For the reasons stated above, Mr. Thayer's petition for a writ of prohibition is denied.

*Denied.*

BROCK, C.J., and HORTON, BRODERICK, NADEAU, and DALIANIS, JJ., did not sit; MANIAS, MANGONES, O'NEILL, COFFEY, and SMUKLER, JJ., sat by special assignment under RSA 490:3.